**ROANOKE RIVER BASIN ASSOCIA-TION, Plaintiff–Appellant,**

**and**

**State of North Carolina; Counties of Bertie, Granville, Halifax, Martin, Northampton, Vance, Warren & Washington, NC; Counties of Charlotte, Halifax & Mecklenburg, Virginia, Plaintiffs,**

**v.**

**Ronald E. HUDSON, in his official capacity as Norfolk District Engineer; Wayne A. Hanson, in his official capacity as Wilmington District Engineer; Joseph K. Bratton, Lt. Gen., in his official capacity as the Chief of Engineers**

of the U.S. Army Corps of Engineers; William R. Gianelli, in his official capacity as Asst. Secretary of the U.S. Dept. of the Army; John O. Marsh, in his official capacity as Secretary of the U.S. Dept. of the Army; The City of Virginia Beach, Defendants–Appellees.

National Wildlife Federation; North Carolina Wildlife Federation, Amici Curiae.

STATE OF NORTH CAROLINA, Plaintiff–Appellant,

and

Counties of Bertie, Granville, Halifax, Martin, Northampton, Vance, Warren & Washington, NC; Roanoke River Basin Association; Counties of Charlotte, Halifax & Mecklenburg, Virginia, Plaintiffs,

v.

Ronald E. HUDSON, in his official capacity as Norfolk District Engineer; Wayne A. Hanson; in his official capacity as Wilmington District Engineer; Joseph K. Bratton, Lt. Gen., in his official capacity as the Chief of Engineers of the U.S. Army Corps of Engineers; William R. Gianelli, in his official capacity as Asst. Secretary of the U.S. Dept. of the Army; John O. Marsh, in his official capacity as Secretary of the U.S. Dept. of the Army; the City of Virginia Beach, Defendants–Appellees.

National Wildlife Federation; North Carolina Wildlife Federation, Amici Curiae.

Nos. 90–3049, 90–3050.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 7, 1991.

Decided July 3, 1991.

As Amended Aug. 5 and Aug. 20, 1991.

Alan S. Hirsch, argued Sp. Deputy Atty. Gen. (Lacy H. Thornburg, Atty. Gen., North Carolina Dept. of Justice, Raleigh, N.C., on brief), for plaintiff-appellant State of N.C.

Patrick M. McSweeney, argued (Michael V. Hernandez, McSweeney, Burtch & Crump, P.C., Richmond, Va., on brief), for plaintiff-appellant Roanoke River Basin Ass'n.

George A. Somerville, argued, Mays & Valentine, Richmond, Va., Robert L. Klarquist, argued Lands and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C. (John F. Kay, Jr., M. Scott Hart, Susan Warriner Custer, Mays & Valentine, Richmond Va., George W. Van Cleve, Acting Asst. Atty. Gen., Glen R. Goodsell, J. Carol Williams, U.S. Dept. of Justice, Washington, D.C., Margaret Person Currin, U.S. Atty., Stephen A. West, Asst. U.S. Atty., Raleigh, N.C., Leslie L. Willey, City Atty., Jeffry A. Sachs, Asst. City Atty., City of Virginia Beach, Virginia Beach, Va., John R. Jordan, Jr., Robert R. Price, Jordan, Price, Wall, Gray & Jones, Raleigh, N.C., on brief), for defendants-appellees.

S. Elizabeth Birnbaum, National Wildlife Federation, Washington, D.C., for amici curiae.

Before HALL and NIEMEYER, Circuit Judges, and KISER, District Judge for the Western District of Virginia, sitting by designation.

## OPINION

KISER, District Judge:

■ The State of North Carolina and the Roanoke River Basin Authority have appealed a decision of the Army Corps of

Engineers to issue a permit to the City of Virginia Beach, Virginia to construct a water intake structure and pipeline that would divert sixty million gallons of water a day from Lake Gaston, a lake that is part of the Roanoke River system, approximately 85 miles to connect to Virginia Beach's water supply. Our review, like that of the district court, is limited to a determination of whether the Corps' decision was "arbitrary, capricious, otherwise not in accordance with law, or unsupported by substantial evidence." 5 U.S.C. § 706(2). We conduct the review without giving deference to the district court's decision. *VAGA v. Donovan*, 774 F.2d 89, 93 (4th Cir.1985). We affirm the district court's finding that the Army Corps of Engineers complied with all appropriate statutory provisions.

## I. *Background* [1]

Virginia Beach is the largest city in Virginia, and has an inadequate supply of potable water. Aside from five emergency wells intended for contingency use only, Virginia Beach depends entirely on the City of Norfolk for its water. The city has suffered from recurrent water shortages, and has been forced to ration water on several occasions. After considering several alternatives, Virginia Beach decided that its best water source for the future would be a pipeline from Lake Gaston.

On July 15, 1983, Virginia Beach applied to the Norfolk District of the Army Corps of Engineers for a permit to construct a water intake structure, pier, boathouse and ramp in the Pea Hill Creek tributary of Lake Gaston in Brunswick County, Virginia, and a sixty-inch inside diameter concrete pipe to extend to Norfolk's water treatment facilities. The pipeline would carry up to sixty million gallons per day (mgd). Eighty percent of the water would go to the city of Virginia Beach, and the remainder to nearby towns and counties.

The pipeline, like all construction affecting navigable waters within the United States, required permission from the Army Corps of Engineers. 33 U.S.C. § 403. On October 11, 1983, the Norfolk, Virginia District Corps issued a draft Environmental Assessment (EA) and a preliminary Finding of No Significant Impact (FONSI) for public review and comment. After holding three public hearings, and allowing the required 30 day comment period, the Norfolk District Corps issued the requested permit on January 9, 1984.

The pipeline would also require reallocation of storage in Kerr Reservoir, upriver from Gaston Lake, from power to water supply. This change required the approval of the Wilmington, North Carolina District Corps of Engineers. On January 13, 1984, the Wilmington District Corps adopted the EA prepared by the Norfolk District, and issued a FONSI concluding that the proposed reallocation of storage would have no significant environmental impact.

The State of North Carolina filed this suit on January 12, 1984, seeking to prevent the pipeline from being constructed. The Roanoke River Basin Authority, eight counties in North Carolina and four counties in Virginia later intervened as plaintiffs.

Virginia Beach initiated a declaratory judgment action in the Eastern District of Virginia on January 9, 1984 (three days before the North Carolina action was initiated), seeking a declaratory judgment that the permit and contract were valid. That action was transferred to the Eastern District of North Carolina after this Court determined that the Virginia district court had no personal jurisdiction over the Governor of North Carolina, a named defendant. *City of Virginia Beach v. Hudson*, 776 F.2d 484 (4th Cir.1985). The action was later dismissed because Virginia had raised all of the same arguments as an intervenor in the case filed by North Carolina. *Hudson I*, 665 F.Supp. at 433.

On July 7, 1987, Chief Judge Britt issued his first ruling. He approved most of the

---

**1.** The procedural history and legal and factual background are set forth in detail in two district court decisions in this case, *North Carolina v. Hudson*, 665 F.Supp. 428 (E.D.N.C.1987) (*Hud-* *son I*), and 731 F.Supp. 1261 (E.D.N.C.1990) (*Hudson II*), and we will not undertake repeating those details here.

findings of the Corps, but remanded the matter to the Norfolk District Corps for further inquiry on two issues: (1) to conduct an additional investigation of the effects of the proposed project on anadromous striped bass to determine whether an Environmental Impact Statement (EIS) would be required; and (2) to make a determination of the extent of Virginia Beach's water needs. *Hudson I.* In response to this order, the Corps filed a Supplement Environmental Assessment, a Supplemental Statement of Findings (SSOF), and a Revised Finding of No Significant Impact (RFONSI). The Corps reissued the permit, adding a new mitigation condition to maintain sufficient flow during bass spawning season. On February 2, 1990, Judge Britt issued a final decision approving the permit. *Hudson II.* The matter is now ripe for appeal.

## II. *Environmental Issues*

### A. *Possible Impact on Striped Bass*

■ Appellants challenge the Corps' decision not to prepare an EIS in light of the possible impact that the pipeline might have on the striped bass population of the Roanoke River. An EIS must be prepared for any "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332. If a mitigation condition eliminates all significant environmental effects, no EIS is required. *C.A. R.E. Now, Inc. v. F.A.A.*, 844 F.2d 1569, 1573 (11th Cir.1988). The Corps has assumed that the project is a major federal action, and we shall defer to this determination. *See Hudson I*, 665 F.Supp. at 438. The only issue, then, is whether the withdrawal of 60 mgd from Gaston Lake might significantly affect the environment.

The Council on Environmental Quality has defined the term "significantly." 40 C.F.R. § 1508.27(b).

"[S]ignificantly" as used in NEPA requires considerations of both context and intensity.

Appellants assert that three of ten listed measurements of intensity are present in this case, and that these require that an EIS be conducted.[2]

(4) The degree to which the possible effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects are highly uncertain or involve unique or unknown risks.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.

■ Appellants claim that the level of controversy concerning the effect of the project on the striped bass population requires an EIS. The Corps found that the mitigation condition would eliminate the causes of the controversy. We find that the Corps' determination was supported by the record and, therefore, is not arbitrary and capricious.

Since 1971, the Corps has required the operators of upriver dams to release sufficient water to maintain Kerr Lake at a level between 299.5 and 302 feet during spawning season, which typically runs from April 26 to June 15. Kerr Lake, in turn, releases to Gaston which, in turn, releases to Roanoke Rapids. This release is intended to maintain a level of 13 feet in the river at Weldon, downstream from Roanoke Rapids Dam. J.A. 1807. In 1988, at the recommendation of the Roanoke River Water Flow Committee,[3] the increased flow

---

**2.** *Amicus* claims that several other factors are also present. The considerations required by the listed definitions tend to overlap, and the evidence supporting *amicus'* claim is essentially the same as that cited by appellants.

**3.** The Committee was formed after the case was remanded to the Corps for a further determination of the environmental impact on bass. The district court noted that "the formation of a committee of 'experts' to deal with a question of the flow of water in a river without inviting the Corps, the acknowledged "expert" in such matters, raises some doubt about the impartiality of the committee and the credibility of its findings." *Hudson II*, 731 F.Supp. at 1269. Nonetheless, the Corps considered its recommendations in the SSOF. J.A. 1837–38.

period was augmented to run from April 1 to June 15, and also modified so that flow levels more closely replicate conditions prior to impoundment of Kerr Reservoir in 1953. For a variety of reasons, the dam releases have sometimes been insufficient to maintain the required flow levels on some days during the augmented flow period. The Corps determined that the best measure of possible impact on the bass population of the pipeline would be the number of additional "lost flow" days, where the river level is below the required level. The Corps then found that the pipeline would cause, at most, one additional "lost flow" day every seven years, where the stream level would fall below the prescribed limits under the 1971 standard. J.A. 1836.

The Corps believed that one lost flow day every seven years would have no significant effect on the bass population. Indeed, it pointed to some evidence suggesting that spawning increases during years of relatively low flow. J.A. 1808. However, it recognized that the effect of one additional low flow day every seven years might be controversial and, if this were to occur, an EIS might be required.

To avoid even a slight increase in the number of lost flow days, the Corps directed that Virginia Beach use storage water it purchased in Kerr Reservoir (upstream from Gaston Lake), instead of water already dedicated to the augmented spawning flows, to offset all downstream effects of its withdrawals. J.A. 1838. The Corps found that this mitigation condition would eliminate all possible effects of the pipeline. The district court found that the Corps' mitigation condition is adequate to address any possible environmental effects of the pipeline.

Appellants and *amicus* believe that the mitigation condition is insufficient for several reasons. First, it addresses only the

problem of the number of low flow days. A continuous decrease of the flow by 60 mgd might affect the bass population, even if the number of low flow days was unchanged. Second, it assumes that sufficient storage water will be available in Kerr Lake to maintain the lake level. Finally, the mitigation condition was not made public until the final report, so there was no opportunity for public comment or criticism.

The Corps based its mitigation condition on an entirely reasonable assumption: That the number of lost flow days is the best measure of the effect of the pipeline on the bass population. Plaintiffs generally supported this assumption in the arguments that they submitted to the Corps by focusing on lost flow days as being the decisive factor in determining any adverse impact on the spawning season. For example, the North Carolina Division of Marine Fisheries asserted, "The loss of even the last day of a spawning period could well result in production of a poor year class rather than a normal or exceptional year class." [4] J.A. 830–31. The United States Fish and Wildlife Service, the E.P.A. and the Sierra Club also filed comments based on the same assumption. None of those commenting provided evidence suggesting that the flow levels as currently set were insufficient.[5] The absence of evidence to the contrary virtually compels the conclusion that a lower flow above the required level will have no significant environmental effect. The same organization suggested that "any loss of water could have an extremely significant impact," but it provided no evidence to back up this claim.

The mitigation condition also does not address the problem that flow on days already lost will be even lower. Again, all of those commenting assumed that a low flow day was detrimental to bass spawning, and

4. The Corps *did* consider this comment, and after examining the supporting evidence, concluded that it was completely unsupported. J.A. 1810.

5. Indeed, the modified flow regime introduced in 1988 reduced the required flow through the April 26–June 1 period, while raising the level

for the April 1–25 period. This suggests that lowering the flow within the augmented range is not considered to be problematic. The Corps also found that very high flows "tend to be associated with lower juvenile abundance indices." J.A. 1809.

presented no information on the effect of lowering the flow on days when the level was already below the required amount. An issue never presented to the Corps "must not be made the basis for overturning a decision properly made after an otherwise exhaustive proceeding." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1976). The Corps' failure to consider an effect that was not brought to its attention cannot be faulted.[6]

Appellants and *amicus* also argue that in the event of a prolonged drought, Virginia Beach's storage capacity in Kerr Lake might be insufficient to comply with the mitigation condition. Virginia Beach submitted a Project Hydrologic Model to demonstrate that the greatest need for water in the past 75 years would have required only 54% of Virginia Beach's storage capacity. J.A. 712–13. The Corps verified this model, and found it to be persuasive. J.A. 1810. This determination is not arbitrary and capricious.

Finally, appellants complain that the mitigation condition was not available for public comment. This objection is spurious. The proposed use of Virginia Beach's storage capacity to augment the river's flow was described in the draft Supplemental Environmental Analysis that was presented for public examination on June 6, 1988. J.A. 1065, 1071. The mitigation condition required Virginia Beach to provide water, while the draft simply assumed that the water would be available for that purpose. The Corps' decision to make the mitigation condition mandatory means that the modified permit protects the appellants' interests (and the striped bass) more completely than the proposal available for comment.

■ Several of those commenting from North Carolina, and two federal agencies, the Fish and Wildlife Service and the National Marine Fisheries Service, believed that the effect on the striped bass popula-

tion is sufficiently uncertain that an EIS should be conducted. Appellants argue that the fact that disinterested federal agencies request an EIS is proof that the effect is "controversial," so that the Corps abused its discretion in refusing to commission an EIS. However, the existence of a disagreement as to whether an EIS should be commissioned is not by itself grounds for a court to require an EIS. *Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir.1973). The Corps of Engineers should consider the comments of other agencies, but it need not defer to them when it disagrees. The Corps addressed the specific comments of the other agencies, and explained why it found them unpersuasive. No more is required.

### B. *Effect on Water Quality*

■ Appellants' claim that the Corps did not adequately consider the effect of the pipeline on downstream water quality is also without merit. The Corps based its conclusion on the fact that there would be no quality effect on conditions during times of relatively low flow, as well as average flow conditions. J.A. 174. It found that the withdrawal may increase the total number of days with relatively low flow, but that the effect on the quality of the water would be insignificant. J.A. 174. This finding is supported by the record, and is not arbitrary and capricious. Although there may be some impact, if it is not significant, then an EIS is not required. 42 U.S.C. § 4332(2)(C); *Hudson I*, 665 F.Supp. at 439.

### C. *Failure to Consider Cumulative Impact of Withdrawal*

■ 40 C.F.R. § 1508.27(b)(7) requires that the Corps consider whether a project's environmental effects may be cumulatively significant in conjunction with other environmental conditions that are reasonably foreseeable, even if they are not significant by themselves. Appellants and *amicus* as-

---

6. The Corps also argued in its brief with this Court that the pipeline would have no effect at all on river levels during the lost flow days. Because it did not make this argument in the RFONSI and the other administrative rulings, it

will not be considered here. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

sert that the Corps failed to make this analysis, and that the cumulative effect of this withdrawal of water, in conjunction with anticipated growth of irrigation, population and industry in the Roanoke River basin, may have a significant effect on water quality.

In fact, the Corps did consider whether there would be any cumulative effects on water quality. It concluded that the effects of the withdrawal of water, coupled with anticipated downstream pollution, would not be significant. J.A. 174. It further found that additional pollution in the Roanoke River was not reasonably foreseeable, and that there was not reason to believe that irrigation withdrawals from the river would increase in the future. J.A. 1843. All of these findings are adequately supported by the administrative record, and are neither arbitrary nor capricious.

Plaintiff and *amicus* argue that the Corps failed to consider the cumulative effect of the pipeline on the striped bass population. They note that the striped bass population has been declining for some time, in part, because of overfishing. It claims that even if the pipeline's effect on bass population might be insignificant in itself, it may exacerbate the overfishing and other stresses on the bass.

The Corps fully considered this issue in the SSOF. It found that because of the overfishing, "the small effect of the City's project on stream flows should not have any significant effect on striped bass." J.A. 1835. It further found that any improvement in environmental conditions would be likely to improve the striped bass population. There is an adequate basis for this finding in the record, and it is not arbitrary and capricious. The Corps has discharged its duty to consider the cumulative effects of the pipeline with other existing or foreseeable environmental conditions.

### D. *Failure to Explain Modeling Assumptions*

█ The appellants claim that the computer model used by the Corps was made available to the public only days before the end of the comment period on the proposals. This alleged failure to disclose information made a challenge to the model more difficult to prepare. The appellants concede, however, that they received the computer model shortly before the public comment period ended. They have not explained what use they expect to make of the "the complete articulation of underlying modeling assumptions" that they claim they have never received. It is clear from the record that appellants had ample information available to them to mount a challenge to the Corps' permit. For example, they were able to form a committee of experts, the Roanoke River Water Flow Committee, working without assistance from the Corps, that created its own models and made recommendations on river flow that were fully considered by the Corps. *Hudson II*, 731 F.Supp. at 1269. We are satisfied that the appellants were not prejudiced by any slowness or incompleteness in the Corps' disclosure of modeling information.

### III. *Public Interest Analysis*

█ Appellants also assert that the Corps failed to consider the public interest impact of the pipeline in North Carolina, in violation of 33 C.F.R. § 320.4(a). The public interest analysis conducted by the Corps examined estimates of the population growth for Virginia Beach over the next 40 years, and concluded that the pipeline water will be necessary to meet the needs of Virginia Beach's fast-growing population. J.A. 1842. The district court examined the same data, and concluded that even with the pipeline, Virginia Beach may soon find itself with an inadequate water supply. *Hudson II*, 731 F.Supp. at 1272.

Appellants argue that the Corps acted in an arbitrary and capricious manner when it considered future population growth of Virginia Beach, but not future increased water needs downstream in North Carolina. However, the Corps considered future needs in North Carolina in both the original SOF and the SSOF it wrote on remand. It found in 1984 that although

large corporations were considering building a wood pulp plant and a coal-burning power plant along the Roanoke River, these projects were not firmly committed. J.A. 191. Accordingly, it would be inappropriate to consider the impact of the pipeline on these projects. On reconsideration in 1988, the Corps found that the coal burning plant would not be built, and that the paper manufacturer "is not appreciably closer to deciding to construct a new plant." J.A. 1843. It, therefore, again concluded that it was not reasonably foreseeable that these or any other industrial plants would be appreciably affected by the pipeline. It also found that the need for water for agricultural irrigation varied widely from year-to-year, but that because the principal irrigated crop is tobacco, a crop for which acreage is controlled by the federal government, it was not reasonable that agricultural irrigation would be affected by the new plant.

Appellants' claim that the Corps considered growth only in Virginia Beach and not in North Carolina is incorrect. It considered the potential for growing water needs in both areas, and concluded that increased need was foreseeable for Virginia Beach, and not reasonably foreseeable for North Carolina. This finding is adequately supported by facts in the record, and is not arbitrary and capricious. North Carolina's objection appears to be that if Virginia Beach builds the pipeline, then 60 million gallons of water a day will be unavailable for future use in North Carolina at some point in the far future. This is true, but it is insufficient to stop the project. The Corps properly discharged its duty to conduct a public policy review.

## IV. *Conclusion*

Gaston Lake pipeline is a controversial project because it will remove a substantial amount of water from one river basin to a distant area. However, there is no longer any controversy concerning either the environmental effects on the Roanoke River, or the need for a new supply of water in Virginia Beach, in both absolute terms and relative to the needs of northeastern North Carolina. The Army Corps of Engineers properly considered all factors that it was required to consider before issuing a permit. Its decision to issue a permit for the project shall not be disturbed.

AFFIRMED.