**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

THE NEW RIVER VALLEY GREENS;
SIERRA CLUB; THE NEW RIVER
VALLEY ENVIRONMENTAL COALITION,
<u>Plaintiffs-Appellants,</u>

v.

UNITED STATES DEPARTMENT OF

TRANSPORTATION; FEDERICO F. PENA,
SECRETARY, DEPARTMENT OF
TRANSPORTATION; FEDERAL HIGHWAY
ADMINISTRATION; RODNEY SLATER,
Administrator, Federal Highway
Administration,
<u>Defendants-Appellees.</u>

No. 97-1978

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Jackson L. Kiser, Senior District Judge.
(CA-96-1089-R)

Argued: May 6, 1998

Decided: September 10, 1998

Before NIEMEYER and MICHAEL, Circuit Judges, and
FRIEDMAN, United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Thomas Alan Linzey, THE COMMUNITY ENVIRON-
MENTAL LEGAL DEFENSE FUND, Shippensburg, Pennsylvania,
for Appellants. Jared A. Goldstein, Environment & Natural Resources
Division, UNITED STATES DEPARTMENT OF JUSTICE, Wash-
ington, D.C., for Appellees. **ON BRIEF:** Lois J. Schiffer, Assistant
Attorney General, John W. Watts, Environment & Natural Resources
Division, UNITED STATES DEPARTMENT OF JUSTICE, Wash-
ington, D.C., for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Three groups of citizens, the New River Valley Greens, the Sierra
Club, and the New River Valley Environmental Coalition, appeal an
order of the district court granting summary judgment to the defen-
dant government officials and agencies in the plaintiffs' suit alleging
violations of the National Environmental Policy Act ("NEPA"), 42
U.S.C. §§ 1331 et seq. We affirm.

I.

This case involves the proposed construction of 4.87 miles of four-
lane, divided, limited-access highway near Blacksburg, Virginia.
Though the highway has two unremarkable purposes-- to relieve
traffic congestion between Blacksburg and Christianburg and to
establish a more direct route from the former city to Roanoke -- a
third one has spawned this litigation. Two miles of the westbound
lanes of the highway are to serve as a research and testing subject for
Intelligent Transportation Systems ("ITS"). **1** In this suit, the plaintiffs

_____

**1** According to the defendants,

　　　ITS technologies range from Advanced Traveler Information

contend that the defendants violated NEPA by "segmenting" the ordinary highway project from the ITS adjunct and by failing to supplement the final environmental impact statement ("EIS") upon completing the ITS's design.

The EIS was prepared by the Virginia Department of Transportation and was approved by the Federal Highway Administration on March 26, 1993. It focused almost exclusively on the environmental impacts of the highway itself. Because the specifics of the ITS design were not then known, they could not be evaluated in detail. Nevertheless, the EIS concluded that the ITS

> may involve the installation of some hardware. The hardware to be installed will not be significantly different from hardware which has already been used on various highway projects across the nation and has no identifiable adverse effect on the environment. Should the hardware to be used raise any questions concerning adverse environmental effects, it will be reevaluated prior to installation.

Soon thereafter, the Virginia Department of Transportation learned that the habitat of an endangered plant, the smooth coneflower, might be disturbed by the highway. Consequently, it moved two miles of the road 750 feet southward. In an addendum to the EIS, the Department concluded that the change was minor and did not change the overall picture to a degree significant enough to require the preparation of a supplemental EIS.

_____

> Systems to fully operational Automated Highway Systems (AHS). These technologies involve joining advanced communications and computer technology to automobiles and to the roadside in order to increase safety and capacity on the roadway networks. Specific areas of interest include: advanced communications for wireless data transfer; evaluating sensors and other equipment in a full scale environment; all-weather/night vision enhancement; improving incident management techniques; assessing AHS architectures and protocols; developing ITS technologies for tourism; and [studying] human factors (i.e. the interaction between people and the technology).

"Environmental Reevaluation," April 15, 1997, at 1-2.

3

These same three plaintiffs then brought suit challenging the decision not to prepare a supplemental EIS. The district court granted summary judgment for the defendants, and we affirmed its ruling. New River Valley Greens v. United States Dep't of Transportation, No. 96-2545 (4th Cir. November 17, 1997) (per curiam).

Meanwhile, final design of the ITS hardware took place. As now proposed, the ITS will comprise a two-lane, two-mile test bed; artificial weather-making equipment along one-half mile of the test bed; and a visitors' center. There will be sensors inserted in the test bed, and power and fiberoptic communications lines will be laid underground just off the shoulder on each side of the highway. Other communication equipment will rest atop standard overhead light poles. The weathermaking strip will include machines capable of simulating blizzard (4 inches of snow per hour) and cloudburst (2 inches per hour) conditions, but which will usually be used to simulate more typical weather. A storage tank, pump station, and water lines will be needed to supply the machines with water, though the ordinary storm sewer system will suffice to handle runoff from tests. For a short time early in the project, temporary trailers will be located on the unpaved eastbound lanes. Lastly, the visitors' center will be located on twenty acres of land currently zoned for industrial use.

The test bed will be constructed first, with completion scheduled for the third quarter of 1999. The remainder of the construction timetable is less certain. The westbound lanes will be completed and opened to traffic at some point between 2002 and 2010, with the eastbound lanes following between 2010 and 2015.

Upon learning of these details, the plaintiffs filed this suit seeking to enjoin construction of the highway pending completion of a supplemental EIS. Subsequently, while the suit was pending, the Virginia Department of Transportation completed a detailed, 48-page (plus exhibits) "Environmental Reevaluation" of the project in light of the proposed ITS hardware. The Reevaluation concluded that the proposed hardware "has not resulted in significant environmental impacts not already evaluated in the Final EIS"; hence, a supplemental EIS was not necessary. The parties then filed cross-motions for summary judgment. The district court granted summary judgment for the defendants, and the plaintiffs have brought this appeal.

II.

A.

We review the grant of summary judgment de novo . Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.), cert. denied, 513 U.S. 813 (1994). Summary judgment is appropriate if the pleadings and evidence of record "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).

B.

Unlike other statutes designed to protect the environment (e.g. the Clean Air, Clean Water, and Endangered Species Acts), NEPA imposes no substantive environmental rules. Instead, it creates a somewhat cumbersome procedure whereby executive branch officials are required to assess and consider the environmental consequences of their proposed actions and, where prescribed, to invite and consider the views of the public at large. It does not require the executive branch to choose the least environmentally intrusive option. In fact, once the executive branch has complied with NEPA, the final decision on whether or how to go forward with a project is the executive's alone. Consequently, while we have the authority and duty to review agency compliance with NEPA, we may not review the wisdom of the agency's ultimate substantive decision. Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 227 (1980); State of North Carolina v. Hudson, 665 F.Supp. 428 (E.D.N.C. 1987), aff'd sub nom Roanoke River Basin Ass'n v. Hudson, 940 F.2d 58 (4th Cir. 1991), cert. denied, 502 U.S. 1092 (1992).

NEPA requires the preparation of an EIS for any"major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If the significance of the environmental effects of a proposed action is not apparent at the outset, the federal agency may prepare an "environmental assessment" to determine whether an EIS is necessary. 40 C.F.R. § 1508.9. Should the

5

assessment conclude with a proper "finding of no significant impact," NEPA compliance is complete, and courts owe deference to such a finding. South Carolina ex rel. Campbell v. O'Leary, 64 F.3d 892, 896 (4th Cir. 1995).

In assessing the "significance" of environmental effects, agencies must ask "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(7).**2** To run afoul of this rule is to engage in illegal "segmentation."

The hallmarks of segmentation are where the proposed component action has little or no independent utility or involves such a large and irretrievable commitment of resources that it may virtually force a larger or related project to go forward notwithstanding the environmental consequences. See Maryland Conservation Council, Inc. v. Gilchrist, 808 F.2d 1039 (4th Cir. 1986). In determining whether illegal segmentation has occurred, we ask whether the completion of the first action has a "direct and substantial probability of influencing [the] decision" on the second. North Carolina v. City of Virginia Beach, 951 F.2d 596 (4th Cir. 1991).

We easily conclude that there has been no segmentation here. The project has included ITS since its inception. The final EIS described the ITS and considered its environmental consequences. It may be argued, of course, that the EIS should have included more detail about the ITS hardware. The time for that argument has passed. These

_____

**2** Another regulation with largely the same effect requires "connected actions" to be discussed in a single EIS. "Actions are connected if they: (i) [a]utomatically trigger other actions which may require environmental impact statements[,] (ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously[, or] (iii) [a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1).

6

plaintiffs filed suit challenging the adequacy of the EIS and lost. The matter is res judicata.**3**

C.

Notwithstanding the lack of illegal segmentation, NEPA compliance is never really done until all major federal action is done. Hence, there is a viable question presented by this suit: whether the details of the ITS hardware compelled the preparation of a Supplemental EIS ("SEIS"). The Supreme Court has explained the purpose and role of the SEIS in NEPA's scheme:

> NEPA does not work by mandating that agencies achieve particular substantive environmental results. Rather, NEPA promotes its sweeping commitment to "prevent or eliminate damage to the environment and biosphere" by focusing Government and public attention on the environmental effects of proposed agency action. By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct. Similarly, the broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time. It would be incongruous with this approach to environmental protection, and with the Act's manifest concern with preventing uninformed action, for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval.

Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 371 (1989).

_____

**3** To the extent that plaintiffs are arguing that they were surprised by the inclusion of artificial weather-making equipment in the ITS, and that no one should have been expected to anticipate such equipment, their segmentation claim would depend on a factual showing that the defendants expected to include the equipment but deliberately chose to conceal that expectation. They have made no such factual showing.

An SEIS must be prepared if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing upon the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). The word "significant" carries the weight of this regulation. Without it, NEPA compliance could paralyze executive agencies, forcing them to perpetually reevaluate proposed projects in response to inconsequential tidbits of information,"only to find the new information outdated by the time a decision is made." Marsh, 490 U.S. at 373. Unless the new circumstances or information present a "seriously different picture of the environmental impact of the proposed project from what was previously envisioned[,]" they are not "significant." Hickory Neighborhood Defense League v. Skinner, 893 F.2d 58, 63 (4th Cir. 1990) (internal quotation omitted); see also Marsh, 490 U.S. at 374.

> In reviewing an agency's decision not to prepare a supplemental EIS, a court must undertake a two-step inquiry. First, the court must determine whether the agency took a hard look at the proffered new information. Second, if the agency did take a hard look, the court must determine whether the agency's decision not to prepare a supplemental EIS was arbitrary or capricious. We undertake this inquiry without giving deference to the district court's resolution of the issue.

Hughes River Watershed Conservancy v. Glickman , 81 F.3d 437, 443 (4th Cir. 1996).[4]

That the defendants "took a hard look" at the final ITS design cannot be contradicted. In considerable detail, the Environmental Reevaluation described and assessed the environment impact of the all-weather testing equipment, variable lighting, wireless communication system, surveillance cameras, power supply and data transmission infrastructure, visitor's center, modifications to the highway to accommodate testing (e.g. a turnaround and unusually wide shoulders), and pavement testing. The Reevaluation then assessed the

_____

[4] The standard of review for the agency's decision not to supplement an EIS is supplied by the Administrative Procedures Act, 5 U.S.C. § 706(2)(a). Marsh, 490 U.S. at 375-376.

impacts according to their character as impacts rather than to the specific piece of hardware, e.g. impacts on wildlife, cultural resources, noise, and the like. Finally, several other new bits of information unrelated to the ITS hardware were assessed, and, in some cases, minor revisions to the highway design were made, the effect of which was to reduce the overall environmental impact of the project.

As for the ITS hardware, the Reevaluation concluded:

> As indicated in this overview, the proposed ITS hardware/infrastructure does not involve any significant environmental impact. The majority of the hardware will be installed within the area that will be disturbed as part of the construction of the highway itself. There are requirements for the additional acquisition of minor amounts of land; however, such a requirement is a normal part of any project's detailed design process that can only take place following FEIS and corridor approval. In conclusion, the design and refinement of the ITS hardware/infrastructure for the project does not present a significantly different environmental picture from that described in the FEIS and the Addendum to the FEIS.

Environmental Reevaluation, at 38.

We hold that the defendants did not abuse their discretion in reaching this conclusion. Unlike in Hughes River, where the plaintiffs demonstrated the inadequacy of the agency's analysis with hard evidence addressing specific impacts, these plaintiffs simply cite certain ITS hardware (e.g. snowmaking equipment, air compressors) and the nature of artificial weather testing and ask us to deem their impacts self-evidently significant. For example, plaintiffs say that the water usage for artificial weather testing will be "massive," but they fail to show or even to suggest that the water will be needed elsewhere, that its discharge will burden the ordinary stormwater drainage system, or that local streams or groundwaters will be degraded. They describe ominous "communications towers," which turn out to be standard overhead light poles.

In short, the "impacts" described by plaintiffs are really fears of impacts. We grant that they are rational fears, but the existence of a

9

rational fear of a significant environmental impact from new information triggers only the "hard look" requirement. Only where, after the "hard look," those fears are substantiated is a supplemental EIS required.

The judgment of the district court is affirmed.

AFFIRMED

10