UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ALLIANCE FOR LEGAL ACTION; J.
RICHARD BLACK; JEAN M. BLACK;
GILSEN C. HAPPEL; ELIZABETH E.
HAPPEL; RONALD M. GOGA; CAROL
E. GOGA; PATRICIA C. EASTIN,
                              *Petitioners,*

                    v.

FEDERAL AVIATION ADMINISTRATION;
JANE F. GARVEY, Administrator,
Federal Aviation Administration;            No. 02-1062
UNITED STATES DEPARTMENT OF
TRANSPORTATION; NORMAN Y.
MINETA, Secretary, United States
Department of Transportation,
                              *Respondents,*

PIEDMONT TRIAD AIRPORT AUTHORITY,
a body politic and corporate of the
State of North Carolina,
                              *Intervenor.*

On Petition for Review of an Order of the
Federal Aviation Administration.

Argued: January 21, 2003

Decided: July 10, 2003

Before WILKINS, Chief Judge, and MICHAEL and
TRAXLER, Circuit Judges.

_____

Petition for review denied by unpublished per curiam opinion.

**COUNSEL**

**ARGUED:** Bruce J. Terris, TERRIS, PRAVLIK & MILLIAN, L.L.P., Washington, D.C., for Petitioners. M. Alice Thurston, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. Michael Goodman Schneiderman, FOLEY & LARDNER, Chicago, Illinois, for Intervenor. **ON BRIEF:** Demian A. Schane, TERRIS, PRAVLIK & MILLIAN, L.L.P., Washington, D.C., for Petitioners. Thomas L. Sansonetti, Assistant Attorney General, Andrew Mergen, Ellen Durkee, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Daphne A. Fuller, Randy Ellen Hyman, Office of Chief Counsel, FEDERAL AVIATION ADMINISTRATION, Washington, D.C., for Respondents. Michael M. Conway, FOLEY & LARDNER, Chicago, Illinois; William O. Cooke, Jr., COOKE & COOKE, Greensboro, North Carolina, for Intervenor.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

This case concerns the Federal Aviation Administration's decision to approve plans to expand the Piedmont Triad International Airport (PTIA or the Airport) in North Carolina, which is operated by the Piedmont Triad Airport Authority (the Airport Authority). The FAA based its approval on an Environmental Impact Statement prepared in accordance with the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. A non-profit group, Alliance for Legal Action, and seven individuals petitioned this court for review of the FAA's decision, challenging the adequacy of the EIS and requesting that we vacate the FAA's decision and require the agency to prepare a new EIS. Although the EIS was not perfect, we hold that it was sufficient. We therefore deny the petition for review.

I.

PTIA serves the area around Greensboro, High Point, and Winston-Salem, North Carolina. About 17,200 single-family homes and over 2,500 multi-family homes are within a five-mile radius of the Airport. It currently has two perpendicular runways, and various expansion plans have been considered over the years. In 1997 FedEx Corp., the overnight delivery company, solicited expansion proposals from airports in the Carolinas that were interested in accommodating a new FedEx mid-Atlantic cargo hub. FedEx selected PTIA over five other competing airports. After PTIA was selected, the Airport Authority applied to the FAA for approval to expand the Airport to meet FedEx's needs. The expansion proposal calls for the building of a new 9,000-foot runway parallel to the existing 10,001-foot runway and the construction of a 300-acre sorting facility between the two runways. FAA approval is necessary to expand the Airport and to make the project eligible for federal funding. The FAA, as part of its consideration of the application, prepared an environmental impact statement in accordance with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq.

One of the primary purposes of an EIS is to consider alternatives to the proposed project. In fulfilling this purpose, the FAA developed a list of alternative sites for the cargo hub. The agency also developed alternative configurations for the runways and sorting facility at the PTIA site. In the first stage of its alternatives analysis, the agency eliminated most of the alternative sites and configurations because they did not meet the requirements that the hub be located at PTIA and that the airport have two parallel, 9,000-foot runways with space in between for a sorting facility. The five off-site alternatives were eliminated at this first stage mainly because they were not at the PTIA location; nevertheless, the FAA offered additional reasons for rejecting each of the alternative locations. Five of the ten on-site alternative configurations were also eliminated. The next stage of the analysis compared the five remaining on-site configurations and the alternative of leaving PTIA as is (known as the "no-action alternative"). These six alternatives were the subject of extensive environmental analysis documented in the EIS issued in November 2001. On the basis of the EIS, the FAA selected a proposal called W1-A1, a slight modification of the original proposal, and approved the expansion in a Record of

Decision (ROD) issued December 31, 2001. Under the decision the Airport is required to mitigate the problem of increased noise by offering to buy some properties near the Airport and providing insulation for others.

Alliance for Legal Action, a non-profit group representing about 900 persons living near the Airport, and seven individuals (together, ALA) have petitioned this court for review of the FAA's decision approving the Airport expansion project on the ground that it was based on a faulty EIS. The Airport Authority has intervened as a respondent.

## II.

We first consider whether we have subject matter jurisdiction. *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934); *Betty B Coal Co. v. Dir., Office of Workers' Comp. Programs*, 194 F.3d 491, 495 (4th Cir. 1999). Our jurisdiction would be based on federal aviation law, which is collected in Subtitle VII of Title 49 of the United States Code. Subtitle VII is divided into five parts, and the only ones relevant to this case are Part A, Air Commerce and Safety, and Part B, Airport Development and Noise. All of the parties agree that we have jurisdiction under 49 U.S.C. § 46110(a), located in Part A. Section 46110(a) provides that "a person disclosing a substantial interest in an order issued . . . under this part may apply for review of the order." The courts of appeals have exclusive jurisdiction over such an application or petition for review. 49 U.S.C. §§ 46110(a), (c). On the other hand, a person challenging an order *not* covered by § 46110(a) must begin in district court by filing an action under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. The order challenged here, the ROD, contains determinations required by provisions of both Part A and Part B and by other statutes as well. For example, the ROD determines that the proposed expansion is "reasonably necessary for use in air commerce or for the national defense" under § 44502(b), which is in Part A, and as a prerequisite for federal funding it approves of the proposed airport layout plan under § 47107(a)(16), which is in Part B. ALA's challenge to the ROD, however, does not directly involve the Part A determinations. ALA alleges violations of provisions of the Airport and Airways Improvement Act (AAIA), 49 U.S.C. §§ 47101

& 47106, which are in Part B, and of NEPA, a separate statute that is not in Part A.

The first question is whether a petition for review of the FAA's order is within the exclusive jurisdiction given to the courts of appeals by § 46110(a). Specifically, we must decide whether an order including determinations under multiple sections and statutes, with Part A among them, may be considered an order issued under Part A. When a statutory provision makes it "unclear whether review jurisdiction is in the district court or the court of appeals the ambiguity is resolved in favor of the latter." *Gen. Elec. Uranium Mgmt. Corp. v. United States Dep't of Energy*, 764 F.2d 896, 903 (D.C. Cir. 1985) (quoting *Denberg v. United States R.R. Retirement Bd.*, 696 F.2d 1193, 1197 (7th Cir. 1983)). *See also Clark v. CFTC*, 170 F.3d 110, 114 (2d Cir. 1999); *Suburban O'Hare Comm'n v. Dole*, 787 F.2d 186, 192-93 (7th Cir. 1986); *cf. Fl. Power & Light Co. v. Lorion*, 470 U.S. 729, 745 (1985) ("Absent a firm indication that Congress intended to locate initial APA review of agency action in the district courts, we will not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals."). Moreover, "[w]hen an agency decision has two distinct bases, one of which provides for exclusive jurisdiction in the courts of appeals, the entire decision is reviewable exclusively in the appellate court." *Suburban O'Hare Comm'n*, 787 F.2d at 192 (construing predecessor statute to § 46110(a)). *See also Sutton v. United States Dep't of Transp.*, 38 F.3d 621, 625 (2d Cir. 1994). We therefore hold that as long as part of an FAA order is issued pursuant to Part A authority, review of the order is within the exclusive jurisdiction of the courts of appeals under § 46110(a).

We must next clarify whether a petitioner may challenge all parts of the order or just the Part A determinations that got the order into this court in the first place. The statute allows review in the court of appeals of an "order issued . . . under" Part A. 49 U.S.C. § 46110(a). The ROD is a single order containing multiple determinations and findings; it is not a collection of several different orders. By its plain language, the statute does not limit review to claims based on Part A. Therefore, once the order is before an appellate court under § 46110(a), the court may consider a challenge to any part of it. *Cf. Sutton*, 38 F.3d at 624-26 (construing predecessor statute); *City of*

*Rochester v. Bond*, 603 F.2d 927, 936 (D.C. Cir. 1979) ("[W]e cannot imagine that Congress intended the exclusivity *vel non* of statutory review to depend on the substantive infirmity alleged."). *But see City of Alameda v. FAA*, 285 F.3d 1143 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 1899 (2003) (holding that a challenge to Part B determinations in an order involving both Part A and Part B must begin in district court). We therefore have jurisdiction to review the FAA order (or ROD) in its entirety.

## III.

ALA cites both NEPA and the AAIA in stating its case, but its challenge to the EIS is really based on NEPA standards. NEPA's requirement for an EIS is triggered by any "major federal action" that may have a significant effect on the environment, such as the FAA's approval of the PTIA expansion project. *See* 42 U.S.C. § 4332(C). The EIS is the vehicle through which the agency contemplating an action (1) must examine and disclose the action's environmental impact and (2) consider alternatives. 42 U.S.C. § 4332(2)(C)(iii). Here, ALA claims that the FAA's Record of Decision approving the Airport expansion project cannot stand because it was based upon a faulty EIS. ALA challenges the EIS on the grounds that (1) the FAA's statement of purpose and need in the EIS was too narrow, which led the agency to consider an inadequate range of alternatives to the project as proposed by its sponsors, and (2) the FAA fell short in its study of the environmental impacts of the project that it approved.

## A.

An EIS must begin with a statement of the purpose and need for the proposed federal action, 40 C.F.R. § 1502.13; and, as we said above, it must include an evaluation of alternatives to the action, 42 U.S.C. § 4332(2)(C)(iii). The agency need not consider all of the possible alternative actions in the EIS; it is only required to look at those that are reasonable in light of the project's stated purpose. *See Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065-67 (9th Cir. 1998). Here, the EIS states that the purpose and need for the airport expansion project is to build a cargo hub at PTIA with parallel, widely spaced, 9,000-foot runways. ALA claims that this statement defines the project's goals too narrowly, allowing them to be set by

what FedEx (and the Airport Authority, which actually submitted the proposal) wanted from the project. This narrow statement of purpose and need led the agency to consider only alternatives that met FedEx's needs. The FAA, says ALA, should have started with a broader statement that reflected the general goal of building a cargo hub to serve the mid-Atlantic region. A broader statement would have prompted consideration of a wider variety of alternatives.

The statement of a project's purpose and need is left to the agency's expertise and discretion, and we defer to the agency if the statement is reasonable. *Friends of Southeast's Future*. 153 F.3d at 1066-67. The reasonableness of a given statement of purpose and need depends first on the nature of the proposed federal action. Here, the FAA prepared the EIS to consider the environmental impacts of its approval of a proposal sponsored from outside the agency. In this situation, the project sponsor's goals play a large role in determining how the purpose and need is stated. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991); *La. Wildlife Fed'n v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985) (per curiam). *But see Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986) (noting that the agency should consider the project's "*general* goal . . . to deliver coal from mine to utility," not the sponsor's goal of building a coal dock). At the same time, the goals that Congress has set for the agency must also figure into the formulation of the statement. *Citizens Against Burlington*, 938 F.2d at 196.

Here, of course, the goals of the project sponsors (the Airport Authority and FedEx) are to expand PTIA in a configuration that meets FedEx's preferences. ALA argues that the FAA gave those preferences too much weight. The agency, however, is under a congressional mandate to encourage and facilitate the construction of cargo hubs. 49 U.S.C. §§ 47101(a)(4), (7). It is reasonable for the agency to advance this goal by facilitating the construction of efficient cargo hubs. The FAA does not, however, have any expertise in operating hubs. It was therefore appropriate for the agency to take into account FedEx's and the Airport Authority's expertise in designing and locating a hub. *See Citizens Against Burlington*, 715 F.2d at 196-98 & n.6. Moreover, the sponsors' goals and Congress's goal for the agency (facilitating the development of hubs) coincide in this case. These factors made it reasonable for the FAA, in stating the

project's purpose and need in the EIS, to draw on the expertise of the project sponsors and to reflect their goals.

Even if meeting FedEx's (and the Airport Authority's) needs is an appropriate consideration, ALA argues, the airport configuration required by the statement of purpose and need is not necessary to support effective cargo hub operations. But the FAA reasonably determined otherwise. The agency found that the configuration would minimize delays and provide FedEx with several operational advantages, such as the ability to launch all of its planes within a seventy-minute window. Because the agency's determination is supported by substantial evidence, we defer to it. *See Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 61 (4th Cir. 1991).

ALA also argues that the Airport could support FedEx's operations with a new runway shorter than the 9,000 feet required by the statement of purpose and need. Although ALA provides alternate calculations suggesting that a shorter runway would serve FedEx adequately, substantial evidence supports the agency's determination that a 9,000-foot runway is needed. *See id.*

B.

An EIS must include a discussion of the environmental impacts of the proposed action. 42 U.S.C. § 4332(C)(i); *Sierra Club v. Morton*, 510 F.2d 813, 821 (5th Cir. 1975); 40 C.F.R. § 1502.16. ALA argues that the FAA's consideration in the EIS of the environmental impacts of the expansion suffers from three flaws. First, the agency's examination of the effect of the expansion on noise levels is insufficient because it relies on faulty assumptions and does not take adequate account of the intensity of FedEx's nighttime operations. Second, to the extent that the nighttime noise is examined, the data is not presented in a meaningful way. And third, the agency failed altogether to consider aircraft emissions and population growth, two types of environmental impact that ALA considers important.

The agency calculated noise impacts assuming that 95 percent of FedEx's air traffic would pass over the area to the southwest of the Airport. ALA offers several reasons, including competing traffic and wind direction, why FedEx might not keep its traffic over the south-

west, pointing out that the company is under no obligation to follow that pattern. Indeed, the company insisted that the Airport not restrict its pattern. But FedEx's plan for the hub is built around a traffic pattern that will keep its planes to the southwest. FedEx did not want to be tied to this pattern, but the FAA reasonably assumed that the company would generally operate the hub as it has planned. The calculations based on this assumption are supported by substantial evidence, and we will not disturb them. *See Roanoke River Basin Ass'n*, 940 F.2d at 61.

ALA also argues that the FAA's assumptions in its noise calculations failed to account for the extra noise generated by airplanes heavily loaded with freight, taking off into a headwind, or taxiing or waiting on the ground. Furthermore, an improved version of the noise analysis program came out seven months before the EIS was complete, but the FAA did not use it. ALA's major complaint about the adequacy of the noise analysis is that it takes insufficient account of the concentration of FedEx's operations in the middle of the night. The agency used as its primary measurement the daily noise level (DNL), which averages sound across an entire year. This measurement diluted the noise impact of the FedEx planes. But the FAA also performed two other types of noise analysis, the Equivalent Sound Level test (Leq(9)) and the Sound Exposure Level test (SEL), that provided more information on what the noise impact will be at particular times of day. ALA complains that even these measurements do not adequately capture the effects of FedEx's planes taking off one after another in the middle of the night. The agency's expertise on how to measure environmental impacts is entitled to deference. *See Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289-90 (4th Cir. 1999); *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1129-30 (8th Cir. 1999); *Or. Envtl. Council v. Kunzman* 817 F.2d 484, 496 (9th Cir. 1987). "Agencies are entitled to select their own methodology as long as that methodology is reasonable." *Hughes River Watershed Conservancy*, 165 F.3d at 289. The FAA's noise analysis may not have been perfect, but it was not unreasonable.

ALA argues that the alternative noise measurements are not presented in the EIS in a manner that makes them understandable and useful to the people likely to suffer from the noise. The Leq(9) data

is presented in a table but not on a map; the SEL data is plotted on a map, but in a way that does not offer any information beyond what is already available from the DNL map. Providing the public with information about environmental impacts is one of the essential goals of NEPA. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 356 (1989). But the agency's failings on this count in this case are not significant enough for us to reject an otherwise adequate EIS. We only ask whether an EIS contains "[a] reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974). *See also Wyoming Farm Bureau v. Babbitt*, 199 F.3d 1224, 1240 n.13 (10th Cir. 2000). By this standard, the EIS's consideration and presentation of noise impacts were adequate.

ALA identifies two other environmental impacts that it says the EIS should have included: the effect of air pollution from toxic airplane emissions and the effect of population growth induced by the expansion. On the first, ALA cites several studies suggesting (but not concluding) that toxic airport emissions are dangerous to human health. The EPA, which administers air pollution programs, signed off on the FAA's determination that the project would conform with current law. Of course, the fact that the emissions are within legal limits does not mean that they have no impacts that need to be considered. Here, because there is support for the FAA's contention that there is no known cause-and-effect relationship between airplane emissions and human health, the agency was reasonable in its decision not to study these effects further. With respect to population growth, the FAA projects that construction of the hub will lead to population growth of only 2 percent by 2019. In light of the region's projected 25 percent growth for the same period, the hub's projected effects on the area's population were insignificant enough to be left out of the EIS.

The FAA's environmental impact statement was not perfect, but it was adequate to support the agency's decision to approve the expansion project. The petition for review is therefore denied.

*PETITION DENIED*