**ALLIANCE FOR LEGAL ACTION, Gilsen C. Happel, Walter S. Druce, J. Richard Black, and Randall I. Schultz, Plaintiffs,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, Lieutenant General Robert B. Flowers, Colonel Charles R. Alexander, and Piedmont Triad Airport Authority, Defendants.**

Civ. No. 1:04CV00034.

United States District Court, M.D. North Carolina.

April 27, 2004.

---

James E. Tanner, Clark Bloss & Wall, PLLC, Jeffrey K. Peraldo, Greensboro, NC, Carolyn Dorman Mozden, Bruce J. Terris, Terris Pravlik & Millian, Washington, DC, for Plaintiffs.

Gill P. Beck, Office of U.S. Attorney, Jessica Mollie Marlies, George William House, William P.H. Cary, Brooks Pierce McLendon Humphrey & Leonard, William Owen Cooke, Jr., Cooke & Cooke, Greens-

boro, NC, Michael B. Heister, U.S. Dept. of Justice, Environment and Nat. Resource Div., Washington, DC, Justin P. McCorcle, U.S. Army Corps of Engineers, Wilmington, NC, for Defendants.

## MEMORANDUM OPINION

BULLOCK, District Judge.

Defendant Piedmont Triad Airport Authority ("PTAA") owns and operates the Piedmont Triad International Airport ("PTIA") in Guilford County, North Carolina. PTAA is expanding its existing facilities to include an overnight express air cargo hub. Because this project involves discharging "dredge and fill" material into 22.93 acres of wetlands surrounding the airport, PTAA applied for a permit from the United States Army Corps of Engineers ("the Corps"). On December 8, 2003, the Corps issued Department of the Army Permit Number 200021655 ("Section 404 permit") to PTAA pursuant to Section 404 of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("the Clean Water Act").

Plaintiffs, a non-profit corporation and four members of its board of directors, have filed this action under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, seeking to enjoin construction of the hub and to invalidate PTAA's Section 404 permit. On March 2, 2004, the court heard argument on Plaintiffs' motion for a preliminary injunction and denied injunctive relief. This matter is now before the court on Plaintiffs', PTAA's, and the Corps's motions for summary judgment.[1] The Corps has filed a certified copy of the twenty-two volume Administrative Record ("AR"). For the following reasons, the court will grant Defendants' motions for

---

1. PTAA also has filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The arguments in that motion will be considered as part of PTAA's motion for summary judgment.

summary judgment and will deny Plaintiffs' motion.

## FACTS

PTAA's Section 404 permit authorizes construction of a 9,000–foot runway parallel to PTIA's existent 10,001 foot runway, a 300–acre storage facility between the runways on the northeast side, new taxiways, and the rerouting of three area roadways. To facilitate this construction, the permit allows PTAA to discharge 1,450,399 cubic yards of fill into 12,823 linear feet of stream channels and 22.93 acres of wetlands. Work on the project began in January 2004 and is not expected to be fully complete until 2009.[2] (App. Supp. Br. Opp'n Pls.' Mot. Prelim. Inj. Relief, D7, Aff. of Edward A. Johnson ¶ 3.)

Since 1968, PTAA has contemplated building a cargo hub that generally conforms to the project's present configuration. *See* Federal Aviation Administration Record of Decision ("ROD") at 9 (AR 1414) ("the proposed parallel runway and land area for cargo facility have been depicted on the PTIA [Airport Layout Plan] in the currently proposed locations since the publication of the 1968 Master Plan"); *see also id.* (discussing PTAA's 1994 Master Plan, which recommended development of a parallel runway and high speed taxiways); (Johnson Aff. at ¶ 7 (discussing PTAA's Master Plans of 1968, 1973, 1990, and 1994, which depict a parallel runway at approximately the same location as the current plan, and the 1994 plan, which

identifies a "Future Air Cargo Area" on the site chosen for the FedEx hub)); AR 5301–05 (PTAA documentation of these plans). However, PTAA has tailored the proposed improvements to accommodate FedEx Corp. ("FedEx"), an overnight delivery company that will operate the cargo hub. In November 1997, FedEx sought to establish a Mid–Atlantic cargo hub in the Carolinas and solicited proposals for the project from regional airports. *See* AR 5484. PTIA, Raleigh–Durham International Airport, Charlotte International Airport, North Carolina Global Transpark, Greenville–Spartanburg International Airport, and Columbia Metropolitan Airport submitted proposals. FedEx then evaluated each airport based on criteria such as airport operation, configuration, and airfield capacity; site selection and environmental constraints; and financial considerations. *See* Federal Aviation Administration Final Environmental Impact Statement ("EIS") § 2.2.2.2. In April 1998, FedEx selected PTIA as its desired site.[3]

To obtain approval of the construction plans and determine its eligibility for federal funding, PTAA submitted a project proposal to the Federal Aviation Administration ("FAA"). In accordance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the FAA prepared an Environmental Impact Statement ("EIS"). In the EIS, the FAA formulated a purpose statement for the

---

2. PTAA's expansion project will proceed in two phases. In Phase I, approximately 24 aircraft will arrive and depart from the hub each night, five nights per week. In Phase II, which is expected to begin a few years after Phase I is complete, the hub is projected to accommodate approximately 63 aircraft arrivals and departures each night, five nights per week. (App. Supp. Br. Opp'n Pls.' Mot. Prelim. Inj. Relief, D7, Aff. of Edward A. Johnson ¶ 3.) PTAA's Section 404 permit includes both phases of construction.

3. FedEx has not disclosed its evaluation of each airport under these criteria. However, FedEx did supply the FAA with a list of criteria in which PTIA was the most competitive of the applicants. *See* Environmental Impact Statement ("EIS") § 2.2.2.2; *see also* § 3.2.1.1. ("FedEx states that ... PTIA was the top-rated airport in all criteria including detailed analysis of Airport Operations, Site Selection, and Financial Analysis.").

project, analyzed alternatives to PTAA's proposal, and considered preliminary environmental impacts.

The FAA determined that PTAA's goals of accommodating regional air transportation needs and continuing to be an economic generator for the area were consistent with federal transportation policy and the public interest. *See* EIS §§ 2.2.1; 2.2.2.1. In light of these goals, the FAA defined the project's purpose as "to develop facilities at PTIA that would provide airside, landside, and surface transportation improvements to support the development and efficient operation of an overnight express air cargo hub facility at PTIA." EIS § 2.2.3.5. The FAA concluded that the following improvements were necessary to fulfill this purpose: an airfield with a redundant transport runway system with a runway a minimum of 9000 feet long; an airfield system that can accommodate dual simultaneous independent operations and head-to-head operations when "Instrument Flight Rules" or "Instrument Meteorological Conditions" exist; and an air cargo hub of sufficient size, geometry, and location to allow flexible, efficient package processing. EIS § 2.2.3.

In its EIS, the FAA discussed how each of these elements would meet the operational requirements of an overnight, express air cargo hub. *See* EIS §§ 2.2.3– 2.2.3.3. As part of its assessment, the agency relied on a computer simulation tool called Total Airport and Airspace Modeling ("TAAM") to compare the efficiency and cost of the existing runway configuration with the proposed configuration. EIS §§ 2.2.3.2; 3.2.1.3; AR 5596 ("A Report of Four Runway Alternatives for Piedmont Triad International Airport Simulated in Total Airport and Airspace Modeller"). The TAAM simulation accounted for factors such as arrival/departure routes to and from paired cities, aircraft fleet mix, time of operation, and traffic control proce-

dures at PTIA. Based on the TAAM data, the FAA indicated that the three elements of PTAA's proposed configuration would provide efficient and safe cargo hub operations and that the parallel runway system ultimately would benefit all airport users by improving PTIA's operational efficiency. *See* EIS §§ 2.2.3.2; 3.2.1.3. Though PTAA suggested this configuration based on FedEx's operating requirements, the FAA confirmed that:

> Based on FAA planning guidelines, the greatest degree of operational capacity improvement is achieved through the development and use of widely spaced parallel runways that allow the ability to conduct dual simultaneous independent operations and efficient head-to-head operations in all weather conditions. No other runway configuration provides for a comparable level of hourly and total daily operations.

EIS § 3.2.1.3. (citing FAA AC 150/5060–5, Change 2, *Airport Capacity and Delay,* 1995).

After identifying the project purpose and defining the improvements central to meeting that purpose, the FAA identified practicable alternatives to PTAA's proposal using a three-tier scheme. At Level One, the FAA evaluated each alternative based on its ability to meet the project purpose (*i.e.,* to develop an air cargo hub at PTIA, construct a 9000–foot parallel runway, provide the ability to conduct head-to-head operations and dual simultaneous independent operations, and place a 300–acre cargo facility between the runways). *See* EIS § 3.2.1.4. Those alternatives meeting the Level One requirements were then evaluated at Level Two for constructability, with an emphasis on impacts to existing infrastructure, property acquisition, relocation of residences and businesses, costs, and preliminary environmental impacts. *See* EIS § 3.2.2. At Level

Three, project alternatives were subjected to a more rigorous environmental analysis, including an examination of each alternative's effect on wetlands and floodplains. *See* EIS § 5.

The FAA subjected forty-two alternatives to Level One analysis. These alternatives included off-site airports, construction of a new airport, on-site configurations, and a no-action alternative. The FAA recognized that it could not authorize construction of the cargo hub at any airport other than PTIA. *See* EIS §§ 3.2.1.1; 3.3.1. Thus, all off-site alternatives were eliminated at Level One. Nevertheless, the FAA briefly evaluated the off-site alternatives to determine if any conformed to other aspects of the project purpose. The FAA summarily rejected each of the off-site alternatives for various safety or constructability reasons apart from its off-site status. *See* EIS § 3.3.1.2.

The FAA then evaluated forty on-site alternatives (eight runway configurations matched against five site configurations) in addition to PTAA's preferred alternative and the Citizens Scoping Alternative that Plaintiffs submitted. *See* EIS Table 3.3.3–1. The FAA eliminated many on-site alternatives because they could not meet the FAA's safety requirements or the project parameters. *See id.*; EIS § 3.3.3.2. Specifically, Plaintiffs' Citizens Scoping Alternative was rejected because the "use of perpendicular runways under the citizens alternative would result in operational conditions that would lessen the overall efficiency of aircraft operations . . . and result in potential safety concerns such as in-

creased use of a designated crosswind runway and increased runway crossings at PTIA." EIS § 3.3.3.2.

The FAA advanced only five on-site alternatives and the "no action" alternative to Level Two. Each of these alternatives also underwent Level Three environmental analysis. *See* EIS Table 3.3.3–1; § 5. As a result of its alternatives analysis, the FAA concluded that Alternative W1–A1, which had the least impact on wetlands, should be selected for the project. *See* EIS Table 3.3.3–1; EA at 6 (AR 6099) (demonstrating that W1–A1 impacted 24% of wetlands compared to other on-site alternatives, which impacted 37% of wetlands).[4]

On December 31, 2001, the FAA issued its Record of Decision ("ROD") for the project. The ROD approved PTAA's proposal implementing Alternative W1–A1 as the project design. The ROD also granted federal environmental clearance for PTAA's application for federal funding and confirmed that PTAA had taken the necessary safety actions for the project. *See* ROD at 105–07 (AR 1519–21).

While the FAA approval process was ongoing, PTAA informed the Corps of its expansion plans. Before PTAA submitted its Section 404 permit application, the Corps participated in a "pre-application conference" with PTAA, the North Carolina Department of Water Quality, the City of Greensboro, and other interested parties. *See* AR 4692–97. The Corps also met with PTAA to discuss the FAA's draft EIS, AR 6772–76, and submitted comments to the FAA regarding its draft alternatives analysis. *See* AR 4671–73.

4. Plaintiffs challenged the adequacy of the FAA's EIS under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* Specifically, Plaintiffs claimed that the FAA defined the purpose of the project too narrowly and did not adequately consider alternatives. In *Alliance for Legal Action v. FAA*, 69

Fed.Appx. 617, 2003 WL 21546006 (4th Cir. July 10, 2003) (per curiam) (unpublished), the United States Court of Appeals for the Fourth Circuit held that the FAA's EIS was sufficient to meet NEPA's requirements. *Alliance v. FAA*, 69 Fed.Appx. at 624.

On May 17, 2000, PTAA submitted its Section 404 permit application to the Corps. The application included an alternatives analysis section which referenced the FAA's alternatives analysis for the EIS. *See* AR 9–11. The application also included a Wetland and Streams Mitigation Plan which outlined the measures PTAA would take to minimize, avoid, and compensate for the project's environmental impacts. Throughout the permitting process, Corps engineers held numerous meetings with PTAA representatives to discuss the Wetlands and Streams Mitigation Plan. *See, e.g.,* AR 3425–27; 3665–3700; 4692–94. The Corps reviewed and rejected multiple draft plans as insufficient, citing, among other problems, the difference in functionality between the proposed mitigation and the existing wetlands. *See, e.g.,* AR 3531–33; 3450–54; 3571–73.

On November 25, 2003, the Corps issued an environmental assessment ("EA") of the project. In the EA, the Corps formulated a purpose statement nearly identical to that articulated in the EIS/ROD. *See* EA at 4 (AR 6097); EIS § 2.2.3.5. The Corps also adopted the FAA's alternatives analysis, finding FAA's assessment sufficient to satisfy NEPA and the EPA's Section 404(b)(1) Guidelines issued pursuant to the Clean Water Act. *See* EA at 2 (AR 6095) ("[The Corps] has reviewed the FAA–FEIS and FAA–ROD, evaluated the anticipated impacts outlined therein, and generally concurs with the findings in these documents."); *id.* at 5 (AR 6098) ("I find that the discussion ... [in] the FAA–FEIS adequately discusses alternative designs for the project as required by NEPA and the 404(b)(1) Guidelines").

The Corps did not re-evaluate any rejected alternatives or examine additional alternatives. Instead, with regard to off-site alternatives, the Corps affirmed the FAA's conclusions. The EA noted that though "FedEx's search for an appropriate host facility has been documented in the FAA–FEIS ... PTAA is the project applicant and the air cargo hub has been part of PTAA's long-range plan for several years." *Id.* Because "[the] Section 404 public interest review focuses on only those alternatives reasonably available to the applicant," the Corps decided that "onsite alternatives were determined to be the only reasonable, practicable, or feasible alternatives that would meet the project's purpose and need." *Id.*

With regard to on-site alternatives, the Corps deferred to the FAA's formulation of the project goals and design. *Id.* The Corps asserted that it was "not the appropriate agency to provide a comprehensive analysis of airport location or design.... We do not feel qualified to second guess the determination by FAA regarding many elements of the airport expansion alternatives, as FAA is the appropriate agency to do such analyses and make such decisions." *Id.* at 26 (AR 6119). The Corps agreed that Alternative W1–A1 would result in the least overall impacts to wetlands.

To minimize the project's unavoidable environmental impacts, the Corps incorporated a revised version of PTAA's Wetlands and Streams Mitigation Plan into the Section 404 permit. The plan required the creation of 17.9 acres of wetlands, restoration of 13.4 acres, and preservation of 69.9 acres to compensate for the destruction of 22.93 acres of wetlands surrounding the airport. In addition, the permit contained "special conditions" and "mitigation monitoring requirements" to ensure the success of the proposed mitigation. *See* AR 6053–58. Because the Corps believed that these measures would offset the project's adverse effects, the Corps determined that the project would not have a significant impact on the human environment. EA at 39 (AR 6132). On December 8, 2003, the Corps issued the Section 404 permit, find-

ing that PTAA had clearly demonstrated that no practicable alternative sites were available and that the project was in compliance with the Section 404(b)(1) Guidelines. *See id.* at 27–28, 39 (AR 6120–21, 6132).

Shortly thereafter, Plaintiffs filed this action requesting that the court declare the permit invalid and enjoin construction at PTIA. Plaintiffs challenge the permit on two grounds. First, Plaintiffs claim the Corps's alternatives analysis was inadequate under the Section 404(b)(1) Guidelines. Second, Plaintiffs allege that the Corps approved a mitigation plan that did not conform to EPA requirements.[5]

## DISCUSSION

### I. Standard of Review

Summary judgment is granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the burden of persuasion on the relevant issues. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Here, all parties have moved for summary judgment. Nevertheless, if the court determines that the record is incomplete or inadequate, summary judgment may be denied, and the case may be remanded to the agency to complete its findings. *See Natural Res. Def. Council, Inc. v. Muszynski,* 268 F.3d 91, 103 (2d Cir.2001); *Raymond Proffitt Found. v. United States Environmental Protection Agency,* 930 F.Supp. 1088, 1102 (E.D.Pa.1996).

█ In ruling on summary judgment, the court must follow the standard of review applicable to actions brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. The APA mandates that final agency action shall be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it was taken "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D). An agency decision is arbitrary and capricious if the agency "relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Hughes River Watershed Conservancy v. Johnson,* 165 F.3d 283, 287–88 (4th Cir.1999). The party challenging the agency's decision bears the burden of showing the decision was arbitrary and capricious.

Judicial review for APA cases is generally limited to the administrative record considered by the agency in rendering its decision. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419–20, 91 S.Ct. 814, 28 L.Ed.2d 136 (1973), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). In reviewing the agency's actions, the court cannot substitute its judgment for that of the agency. *Id.* at 416, 97 S.Ct. 980. The agency's actions need not be the best or most reasonable, and the court may not set the Corps's decision aside "simply because the court is unhappy with the result reached." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). The relevant inquiry is whether the agency's decision was based on consideration of relevant factors and whether there has been a clear error of judgment.

---

**5.** In their complaint, Plaintiffs also challenged the Corps's mitigation requirements under North Carolina law. They no longer assert this claim. (Mem. Opp'n Cross–Mot. of United States Summ. J. & Mot. of PTAA Summ. J. at 35 n. 7.)

*Overton Park*, 401 U.S. at 416, 91 S.Ct. 814.

## II. Plaintiffs' Standing [6]

■ Plaintiffs bring their challenge pursuant to Section 10 of the APA, 5 U.S.C. § 702, which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. To establish standing under this section of the APA, Plaintiffs must demonstrate that the contested agency action will cause them an injury in fact and that the injury affects an interest "arguably within the zone of interests to be protected" by the statute at issue. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998); *Data Processing Serv. Org. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). A great or substantial injury is not required; an "identifiable trifle" will suffice if it is actual and particularized to the plaintiff. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

■ Plaintiffs in this case have adequately demonstrated that they have standing. Plaintiffs allege that the project will increase stormwater runoff, which may cause flooding and reduce water quality. *See* Compl. ¶ 10. Though the record emphasizes ways to mitigate these impacts, it also lends support to Plaintiffs' claims. *See, e.g.*, EIS § 5.6.3.5 ("[A]n average of approximately 56.5 and 4.2 million gallons of water per year within the Brush Creek and Horsepen Creek sub-basins, respectively, would no longer infiltrate the soil .... This water would become stormwater runoff. Increased stormwater runoff, if not properly mitigated, can cause downstream flooding, erode banks, and degrade water quality by carrying pollutants and sediments to surface waters."); *see also* ROD at 58 (AR 1469); ROD at 69 (AR 1480); ROD at 70 (AR 1481).

Many members of Plaintiffs' organization live within one mile of the proposed runway and reside downstream from the project. (Compl. ¶¶ 9–10). Some live on property adjacent to the affected wetlands. *Id.* Members of the board of directors and contributors also use the municipal water supply that draws on the stream channels and wetlands surrounding the airport. *Id.* Consequently, Plaintiffs' concerns regarding flooding and water quality are sufficient to demonstrate a particularized injury that falls within the zone of interests protected by the Clean Water Act. [7]

## III. Relevant Law

The Clean Water Act was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is authorized by permit. The Corps's authority to issue these permits derives from Section 404 of the Clean Water Act, 33 U.S.C. § 1344(a), (d). The

---

**6.** Plaintiffs recently filed a motion for a declaratory judgment on the issue of standing. (Pls.' Mot. Decl. J. That They Have Standing to Maintain This Action). A separate ruling on this motion is unnecessary in light of the discussion above.

**7.** An organization has standing to sue on behalf of its members when the members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members to participate in the lawsuit. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Plaintiffs have satisfied this organizational standing requirement as well.

permitting process is governed by Environmental Protection Agency ("EPA") regulations, 40 C.F.R. Part 230 ("Section 404(b)(1) Guidelines"), and Corps regulations, 33 C.F.R. Part 320–330.

Under the Section 404(b)(1) Guidelines, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). The Guidelines further provide:

> An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded, or managed in order to fulfill the basic purpose of the proposed activity may be considered.

40 C.F.R. § 230.10(a)(2). If a project that involves the filling of wetlands is not water dependent, the Corps must presume that practicable alternatives exist that do not impact wetlands unless the project applicant clearly demonstrates otherwise. *See* 40 U.S.C. § 230.10(a)(3); Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed.Reg. 85,336, 85,339 (Dec. 24, 1980).

IV. Alternatives Analysis

A. Burden to clearly demonstrate alternatives

Plaintiffs assert that the Corps has failed to clearly demonstrate that there are no practicable alternatives with less effect on wetlands. (*See* Pls.' Mem. Opp'n to Cross–Motion of United States Summ. J. & Mot. of PTAA Summ. J. at 4.) Plaintiffs contend that "[n]either the EA nor any other Corps document made a finding that it had clearly demonstrated that no practicable alternatives exist, nor does the EA or any other Corps document set forth evidence that would support such a finding." *Id.* The Section 404(b)(1) Guidelines state that when a project is not water dependent, practicable alternatives not involving a discharge into wetlands are presumed to exist "unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3). Because the Corps did not make this showing, Plaintiffs maintain that the agency's actions in approving the permit are arbitrary and capricious.

However, the burden to clearly demonstrate a lack of practicable alternatives lies with the project applicant, not with the Corps. *See* Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed.Reg. 85,336, 85,339 (Dec. 24, 1980) ("the *applicant* may rebut the presumption [that practicable alternatives exist] through a clear showing in a given case") (emphasis added); *see also Utahns for Better Transp. v. United States Dep't of Transp.,* 305 F.3d 1152, 1163 (10th Cir. 2002); *Reichelt v. United States Army Corps of Eng'rs,* 923 F.Supp. 1090, 1094 (N.D.Ind.1996); *O'Connor v. Corps of Eng'rs, United States Army,* 801 F.Supp. 185, 190 (N.D.Ind.1992); *Korteweg v. Corps of Eng'rs of United States Army,* 650 F.Supp. 603, 604 (D.Conn.1986) (all stating that the burden to clearly demonstrate alternatives is on the applicant); AR 3286 (Corps Draft Regulatory Guidance Letter stating that "[t]he applicant also must demonstrate that no practicable alternatives exist"). Consequently, the court's inquiry is not whether the Corps has clearly demonstrated a lack of practicable alternatives, but whether its decision that PTAA had done so was a clear error of judgment.

In making this determination, the court must consider the whole record, not indi-

vidual documents in isolation. *See Overton Park*, 401 U.S. at 419–20, 91 S.Ct. 814. To prevail, Plaintiffs must point to facts or factual failings in the record that support their claims. *See Krichbaum v. Kelley*, 844 F.Supp. 1107, 1110 (W.D.Va.1994). If the record reveals that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" the agency's decision is entitled to deference. *Glendale Neighborhood Ass'n v. Greensboro Hous. Auth.*, 956 F.Supp. 1270, 1277 (M.D.N.C.1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

**B. Off-site alternatives**

■ Plaintiffs contend that the Corps's treatment of off-site alternatives was inadequate because other regional airports were eliminated at the first level of analysis. Plaintiffs posit that these airports are practicable alternatives because FedEx is the true applicant for the Section 404 permit. Consequently, Plaintiffs reason that the off-site airports should have been subjected to environmental impact analysis.

To support their claim, Plaintiffs point out that the project was initiated only when FedEx selected PTIA and that the alternatives analysis the Corps adopted expressly included FedEx's "wish list" of specifications as part of the project purpose. (Pls.' Mem. Opp'n Cross–Mot. of United States Summ. J. & Mot. of PTAA Summ. J. at 23–24; Pls.' Mem. Supp. Mot. Prelim. Inj. Relief at 17.) Plaintiffs also argue that the Corps, the FAA, and the public associate the project with FedEx. (Pls.' Mem. Opp'n Cross–Mot. of United States Summ. J. & Mot. of PTAA Summ. J. at 23–24.) Plaintiffs contend that if Defendants are correct in naming PTAA

as the proper applicant, "the issuance of the permit by the Corps depends on happenstance" because the Corps's analysis would be different had the State of North Carolina or FedEx applied for the Section 404 permit. (Pls.' Mem. Opp'n Cross–Mot. of United States Summ. J. & Mot. of PTAA Summ. J. at 27.)

Plaintiffs have cited no authority to support the proposition that the court or the Corps can disregard the named applicant to a Section 404 permit and substitute for it another entity that might benefit from the project. The plain language of the Clean Water Act and the Corps regulations establish that the appropriate project applicant is the person seeking to make the proposed improvements. The statute forbids any person from discharging dredge or fill material into regulated waters unless authorized by permit. *See* 33 U.S.C. § 1311(a). The Corps regulations expressly provide what the statute implies; namely, that the permit applicant is the person who desires to carry out the proposed activity resulting in a discharge. *See* 33 C.F.R. § 325.1(d)(7). The applicant's signature on the permit application "affirm[s] that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application." *Id.*

Under these requirements, PTAA is the correct applicant for the Section 404 permit. Though FedEx is a beneficiary of the proposed improvements, the development itself is PTAA's investment. PTAA, not FedEx, is the property owner that signed the permit application. AR 23 (application signed by agents for PTAA). As the owner, PTAA is liable for the proposed discharge on its land. *See* AR 1101 (construction plans stating that PTAA is the owner responsible for monitoring the project site).[8] Accordingly, PTAA must fulfill the prerequisites to obtaining a permit,

---

**8.** Plaintiffs acknowledge that PTAA and its

contractors, not FedEx, are planning to de-

which include conducting numerous environmental assessments and obtaining project approval from other agencies. PTAA, not FedEx, must fully comply with the permit's requirements and may be penalized if it fails to do so.[9] *See, e.g.,* 33 C.F.R. Part 326 (establishing the Corps's discretionary responsibility to initiate Section 404 enforcement actions). Though Plaintiffs are correct that a different applicant would undoubtedly alter the Corps's analysis, the choice to engage in what may be a long, expensive, and arduous permitting process can hardly be considered "happenstance."

Furthermore, Plaintiffs may prevail on their "sham applicant" theory only if the Corps's conclusion regarding the project applicant was a "clear error of judgment." *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. Plaintiffs cannot make this showing. The record demonstrates the Corps's efforts to ensure that PTAA was the appropriate applicant. For example, a Corps Information Paper prepared by the Chief of the Corps's Raleigh Regulatory Field Office states:

> During a meeting of 2 March 2001 to discuss alternatives addressed in the DEIS, the Corps was advised by PTAA, its consultants, and FAA that the proposed runway expansion and construction of facilities were included in the airport's master plan, last updated in 1994. These facilities were to be constructed by the year 2015 due to anticipated growth and a decline in service, with no thought of FedEx. The proposed siting of FedEx at the Piedmont Triad International Airport (PTIA) moved the process forward by 10 years. Accordingly, PTAA took the lead as the

permit applicant and submitted the DA permit application. We asked PTAA to provide the above information regarding their long-term plans, and the fact that they would build the proposed facilities with or without FedEx, in writing for our records as the DEIS was not sufficiently specific regarding project purpose. Based upon this information, the alternatives analysis required by NEPA and the Section 404(b)(1) guidelines will be restricted to alternatives available to PTIA (*i.e.,* onsite and adjacent to the existing airport) as opposed to all sites considered by FedEx.

AR 3661; *see also* AR 542 (mitigation plan noting that the need for a new runway is documented in the 1994 Master Plan Update ("MPU") and that "the new runway and air cargo requirements have been further refined based on specific operational requirements of FedEx, but these requirements are consistent with the 1994 MPU"); AR 5301–05 (submittal of PTAA's Master Plans and maps demonstrating intention to build cargo hub); AR 5293–94 ("Documentation in the PTIA's master plan showed a projected need for these facilities in 2015. The FedEx interest in locating at PTIA created a more imminent need for the future, planned facilities. With that explanation, [PTAA] confirmed that it is PTIA's intention to build the proposed facilities irrespective of FedEx's actions.").

The Corps did not rely solely on the permit application to determine the "true" applicant for this project. Instead, the record shows that the agency confirmed PTAA's assertion with additional information. The Corps's decision regarding the proper applicant for the Section 404 permit was not arbitrary or capricious.

---

posit fill into the airport's wetlands. (Compl. ¶¶ 18, 29, 33, 34.)

**9.** Conversely, if FedEx, the tenant, decided to relocate its operations, it could leave PTIA

without regard to the environmental consequences of the project and would cease to have an interest in the hub entirely.

Based on its conclusion that PTAA was the correct applicant, the Corps concurred with the FAA's decision to eliminate all off-site alternatives at Level One. *See EA* at 5 (AR 6098) ("[S]ince PTAA is the project applicant and the air cargo hub has been part of PTAA's long-range plan for several years, those off-site alternatives not involving PTAA do not meet the applicant's purpose and need. Off-site alternatives ... have been shown not to be reasonable, practicable, or feasible for PTAA."). This reasoning accords with the Section 404(b)(1) Guidelines, which state that "[i]f it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded, or managed in order to fulfill the basic purpose of the proposed activity may be considered." 40 C.F.R. § 230.10(a)(2). PTAA, the project applicant, could not reasonably obtain, expand, or manage any of the rejected airports, and neither the FAA nor the Corps has the authority to reject PTIA as the project site if PTAA is the proper applicant. *See Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 197 (D.C.Cir.

1991) (NEPA case noting that the free market, not the government, determines where a hub should be sited).

Further, an alternative is only "practicable" if it is available and capable of being done in terms of cost, technology, and logistics. 40 C.F.R. § 230.10(a)(2). Accordingly, an environmental assessment of off-site airports is unnecessary if those airports are not practicable under the Guidelines. Off-site alternatives such as Columbia Metropolitan Airport are neither available to PTAA nor prudent for PTAA to pursue in terms of cost or logistics. Given the governing regulations and the identity of the permit applicant, the Corps's conclusion that PTAA had clearly demonstrated a lack of practicable off-site alternatives was not arbitrary and capricious.[10]

## C. On-site alternatives

■ Plaintiffs maintain that the Corps erred by determining that no practicable on-site alternatives exist with less impact on wetlands than Alternative W1–A1, PTAA's preferred configuration. Particularly, Plaintiffs contend that their pro-

---

**10.** In support of their argument that off-site alternatives should have been more thoroughly considered, Plaintiffs cite *Sylvester v. United States Army Corps of Eng'rs,* 882 F.2d 407 (9th Cir.1989). Plaintiffs assert that the *Sylvester* court "upheld the issuance of the permit, but only after the Corps examined the environmental impacts at two off-site locations." (Pls.' Mem. Supp. Prelim. Inj. Relief at 19). The *Sylvester* court states that "[Petitioner] objects to the Corps's failure to consider off-site locations for the golf course.... The Corps rejected consideration of such an alternative because it 'did not meet [applicant's] basic purpose and need.' The Corps did note, however, that two off-site locations were considered but rejected because of insufficient size and the potential for more severe environmental impacts." *Sylvester,* 882 F.2d at 409. While the Corps rejected the alternative golf course sites partially on the basis of environmental factors, it also rejected the al-

ternative sites because they did not fulfill the project's purpose and need. *Id.*

Plaintiffs also cite *Bahia Park v. United States,* 286 F.Supp.2d 201 (D.P.R.2003) to assert that other courts have upheld decisions to deny Section 404(b) permits for failure to sufficiently consider off-site alternatives. In *Bahia Park,* the Corps denied a developer's permit to build a middle-income apartment complex on wetlands. The Corps decided that the developer had not shown that one of his alternative proposals, which would situate the project on uplands, was impracticable. The court deferred to the Corps's finding that the alternative was practicable and granted summary judgment for the Corps. *Id.* at 207. However, in *Bahia Park,* the developer did not claim he was unable to reasonably obtain, utilize, or manage the off-site, upland alternative. Instead, the developer argued that the alternative site would increase his costs and be unsuited for middle-income housing. *Id.*

posed alternative, the Citizens Scoping Alternative, should have been subject to further analysis because it has almost no impact on wetlands.[11] Plaintiffs claim that by adopting the FAA's definition of the project purpose and evaluation of on-site alternatives, the Corps "[made] what is practicable appear impracticable," *Sylvester v. United States Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir.1989), and acted arbitrarily.

In formulating the project purpose and evaluating alternatives at Level One, the FAA used the criteria that PTAA submitted as FedEx's specifications. As a result, many on-site alternatives were eliminated. In *Alliance for Legal Action v. FAA*, 69 Fed.Appx. 617, 2003 WL 21546006 (4th Cir. July 10, 2003) (per curiam) (unpublished), Plaintiffs challenged whether the FAA could base its alternatives analysis on the information FedEx and PTAA provided. On July 10, 2003, the United States Court of Appeals for the Fourth Circuit determined that the FAA could reasonably rely on the expertise of FedEx and PTAA when crafting the purpose and operational criteria for the project. *Alliance v. FAA*, 69 Fed.Appx. at 622.

Plaintiffs dismiss that case by asserting that the standard for evaluation of alterna-tives under the Clean Water Act differs from that of NEPA, the statute at issue in *Alliance v. FAA*.[12] However, NEPA regulations require that an agency "rigorously explore and objectively evaluate all reasonable alternatives to a project" when preparing an EIS. 40 C.F.R. § 1502.14. This rigorous evaluation is not unrelated to the Corps's analysis. The Section 404(b)(1) Guidelines mandate that "[t]o the extent that practicable alternatives have been identified and evaluated ... such evaluation shall be considered by the permitting authority as part of the consideration of alternatives under the Guidelines." 40 C.F.R. § 230.10(a)(5); *see* Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed.Reg. 85,336, 85,340 (Dec. 24, 1980) ("where an adequate alternatives analysis has already been developed, it would be wasteful not to incorporate it into the 404 process"); *see also* AR 7201 (Army Corps of Engineers Standard Operating Procedures stating that "Districts should strive to communicate the Guidelines alternatives analysis requirements to the lead agency to enable that agency to conduct an analysis of alternatives to satisfy Guidelines requirements and avoid the need for the district to have to conduct a subsequent analysis").

---

**11.** FAA eliminated the Citizens Scoping Alternative at Level One because it did not allow for dual independent operations, head-to-head operations, or for the air cargo facility to be located between the two runways. *See* EIS Table 3.3.3–1. The FAA also noted that this alternative could result in potential safety concerns. *See* EIS § 3.3.3.2.

**12.** NEPA imposes procedural requirements on any agency taking "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources" and prepare an environmental impact statement with its findings. 42 U.S.C. §§ 4332(2)(C),(E). NEPA does not require that an agency reach a particular substantive result. Instead, NEPA simply establishes the procedures that the agency must follow. *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir.1996).

In contrast, the Clean Water Act imposes substantive requirements on the Corps in evaluating alternatives to filling wetlands. Under the Clean Water Act, it is not sufficient for the Corps to consider a range of alternatives to the proposal. If the project is not water dependent, the presumption that there are practicable alternatives with less impact to wetlands must be rebutted. *See* 40 C.F.R. § 230.10(a)(3).

The Guidelines also acknowledge that "the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, will in most cases provide the information for the evaluation of alternatives under these Guidelines." 40 C.F.R. § 230.10(a)(4); AR 7201 (Army Corps of Engineers Standard Operating Procedures stating that "[t]he only fundamental difference between alternatives analyses for NEPA and the Guidelines is that under NEPA, alternatives outside of the applicant's control may be considered"); *see also* 33 C.F.R. § 230.21 (Corps regulations allowing the Corps to adopt another agency's EIS unless there is "substantial doubt as to technical or procedural accuracy or omission of factors important to the Corps's decision."). PTAA incorporated the FAA's alternatives analysis into its Section 404 permit application. Thus, the relevant inquiry is whether the Corps clearly erred in finding that the FAA's alternatives analysis, which was sufficient under NEPA, also was sufficient to satisfy the Clean Water Act.

To conform to the requirements of the Clean Water Act, PTAA must clearly demonstrate a lack of practicable alternatives under the Section 404(b)(1) Guidelines. 40 C.F.R. § 230.10(a)(3). Practicable alternatives are alternatives that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). Whether an alternative is "practicable" often depends on how the project purpose is defined. Plaintiffs contend that the Corps has defined the purpose of this project too narrowly, eliminating practicable on-site alternatives as a consequence. To support their contention that a more general defi-

nition of project purpose should apply, Plaintiffs reference an example in the introduction to the 1980 amendments to the Guidelines:

> An example is a fill to create a restaurant site, since restaurants do not need to be in wetlands to fulfill their basic project purpose of feeding people. In the case of such activities, it is reasonable to assume there will generally be a practicable site available upland or in a less vulnerable part of the aquatic ecosystem.

Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed. Reg. 85,336, 85,339 (Dec. 24, 1980).

The Corps is quick to counter that Plaintiffs' example, which refers to the "basic project purpose," is given to determine whether a project is "water dependent" under 40 C.F.R. § 230.10(a)(3). If the project "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose," then the project is not water dependent, and practicable alternatives to the project are presumed to exist. 40 C.F.R. § 230.10(a)(3). Here, the cargo hub is not water dependent, and the rebuttable presumption regarding practicable alternatives applies.

Once the Corps determines the water dependency of a project, it no longer considers the "basic project purpose" but analyzes practicable alternatives "in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). Army Corps of Engineers Standard Operating Procedures provide that "[t]he overall project purpose is more specific to the applicant's project than the basic project purpose.... [T]he applicant's needs must be considered in the context of the desired geographic area of the development, and the type of project being proposed." AR 7197;[13] *see Louisi-*

---

**13.** For example, the Army Corps of Engineers Standard Operating Procedures cite a proper

overall project purpose as "to construct a

*ana Wildlife Fed'n, Inc. v. York,* 761 F.2d 1044, 1048 (5th Cir.1985) (per curiam) (noting that the Corps has a duty to take the applicant's objectives into account in defining the project purpose). If the applicant's purpose is legitimate, then the Corps is not entitled to reject the purpose and substitute for it one it deems more appropriate. *Sylvester,* 882 F.2d at 409; *see Alliance v. FAA,* 69 Fed.Appx. at 622 (recognizing in NEPA case that when a project is sponsored from outside the agency, "the project sponsor's goals play a large role in determining how the purpose and need is stated").

In this case, one of PTAA's objectives was to utilize the FedEx opportunity to accelerate the airport's long-term goal of building a cargo hub. *See* AR 3661. Plaintiffs claim that even if the Corps should consider this objective, the agency erred by adopting an on-site alternatives analysis based on FedEx's specifications. Plaintiffs posit that if the project is designed to meet PTAA's needs, the Corps should focus on alternatives that would support a "generic air cargo facility," not a hub specifically tailored for FedEx.

Plaintiffs' argument fails to recognize that PTAA's objectives in building the cargo hub align with FedEx's needs in operating it. The purpose and value of an overnight, express cargo hub, whether it be used by FedEx or a competitor, is its quick turnaround time. *See* EIS § 2.2.2.2 ("In the overnight express air cargo business, time is the commodity being sold."); EIS § 2.2.3.2 ("[I]ndustry standard shows that other overnight express parcel carriers also depend on similar time minimization techniques at their respective hub/sort facilities to meet their operational goals."); AR 5561 (Benefit Cost Analysis for PTAA Project, stating, "[a] single aircraft de-

layed at the gate . . . or delayed because of runway capacity . . . can cause as many as 10,000 packages to be delayed, thus resulting in thousands of service failures. Competitive forces dictate that overnight, integrated, express cargo carriers must meet their established deadlines. The consequences of repeated delay is [sic] financial loss and eventually loss of market share."); ROD at 22 (AR 1429) ("Because of the logistical dependency, the first outbound departure to a destination city cannot occur until the last parcels aboard the last inbound aircraft have been unloaded, sorted, and reloaded aboard other outbound aircraft . . . . [T]here is a critical need for the particular location, size and orientation of the air cargo sorting/distribution site that meets the air cargo carrier's operational requirements."). The FAA's planning guidelines and TAAM analysis demonstrated that the configuration best suited to meet the demands of an express air cargo hub was the one PTAA suggested. *See* EIS § 3.2.1.3 (citing FAA AC 150/5060–5, Change 2, *Airport Capacity and Delay,* 1995) ("Based on FAA planning Guidelines, the greatest degree of operational capacity improvement is achieved [under the proposed configuration]. . . . No other runway configuration provides for a comparable level of hourly and total daily operations."); AR 5562 (Benefit Cost Analysis for PTAA Project, stating that "[t]he ideal location for any air carrier hub operation, whether for a cargo or passenger carrier, is between parallel runways with taxiways connecting the hub apron directly to the parallel runways").

PTAA would not expend the resources necessary to undertake a project of this size without ensuring that its hub could attract prospective tenants. PTAA's ob-

---

viable, upscale residential community with an associated regulation golf course in the south

Dade County area." AR 7196.

jective in building the cargo hub was not to invest in a "workable" facility, as Plaintiffs claim is appropriate, but to fulfill the current and future logistical needs of an overnight express air cargo hub, whomever the operator may be. This objective is legitimate. *See Sylvester,* 882 F.2d at 409 ("In evaluating whether a given alternative site is practicable, the Corps may legitimately consider such facts as cost to the applicant and logistics."); *Northwest Envtl. Def. Ctr. v. Wood,* 947 F.Supp. 1371, 1377 (D.Or. 1996) (where plaintiffs contended that Corps defined Section 404 permit applicant's project purpose so narrowly as to preclude other locations, the court upheld the decision, finding "substantial evidence in the record regarding Hyundai's legitimate economic reasons for choosing to construct its project in Eugene").

Plaintiffs also argue that even if the project purpose may take FedEx's needs into account, on-site alternatives that lack FedEx's "wish list" of specifications still are practicable. To support this assertion, Plaintiffs point to FedEx hubs in Memphis, Tennessee; Indianapolis, Indiana; Fort Worth, Texas; and Anchorage, Alaska, as evidence that the three Level One requirements are not necessary for FedEx's cargo hub operations at PTIA. (*See* Pls.' Mem. Supp. Mot. Prelim. Inj. Relief, Ex. 13, FedEx Information Packet, at AU 001949.)

The FAA briefly addressed this concern, noting that while other hubs utilized different configurations, "the existing airport configuration and proposed number of operations [at other hubs], among other factors, might produce different airfield operations requirements." AR 1536. As an example of the different requirements of each hub, PTAA asserts that the FedEx hubs Plaintiffs reference serve multiple time zones, while PTAA's proposed hub would serve only one time zone. This difference results in compressed arrival and departure schedules at PTAA in comparison to the other hubs. (Br. of Def. PTAA Supp. Mot. Summ. J. & Opp'n Pls.' Mot. Summ. J. at 26.)

Thus, merely arguing that FedEx utilizes other hubs with different configurations does not establish that the Corps's elimination of such configurations at PTIA is clearly erroneous. Plaintiffs have not shown that these airports are sufficiently similar to PTIA so as to demonstrate that their configurations would be suitable given PTIA's individual logistical constraints. What is practicable for one project may not be practicable for another. *See* AR 3282 (Corps Draft Regulatory Guidance Letter stating that "The determination of basic and overall project purposes must involve reason and judgment based on the varying and unique characteristics of each application."). Accordingly, Plaintiffs' reference to other FedEx hubs is not persuasive.

In addition to considering the applicant's objectives for a Section 404 permit project, the Corps also should consider "other Federal agencies' views on the proper definition of overall project purpose, regarding a proposed project's appropriate size, need, and configuration." AR 3286. In its EA, the Corps acknowledged that it relied on the FAA to define the overall project purpose because the Corps lacked the FAA's knowledge of airfield operation and regulation. The Corps noted that "given our own lack of expertise in the area of airport expansion, the FAA is the appropriate agency to determine the applicant's purpose and need for the project. Our analysis of the FAA–FEIS indicates that FAA has done an adequate job of analyzing the purpose and need for the project.... Again, we feel that the Corps is not the appropriate agency to provide a comprehensive analysis of airport location or design." EA at 26 (AR 6119).

The Corps may rely on information from other agencies to aid in its decisionmaking process. *See Sierra Club v. Alexander,* 484 F.Supp. 455, 466–67 (N.D.N.Y.1980); *see also Town of Norfolk v. United States Army Corps of Eng'rs,* 968 F.2d 1438, 1447–48 (1st Cir.1992) (finding that Corps reasonably relied on the Massachusetts Water Resources Authority and EPA's alternative analysis to determine the best alternative under the Section 404(b)(1) Guidelines). In this case, the FAA conducted an analysis of the FedEx criteria using analytical tools such as the TAAM program. In addition to utilizing computer modeling, the FAA eliminated many onsite alternatives based on its knowledge of safety and logistical concerns. *See, e.g.,* EIS Summary, S–11—S–16 (explaining that various alternatives could not meet FAA *Standards and Recommendations for Airport Design*); § 3.3.3.2 (discussing safety concerns associated with Citizens Scoping Alternative). The FAA concluded on the basis of this data that the FedEx criteria would provide for safe and efficient hub operations at PTAA.

The Fourth Circuit in *Alliance v. FAA* recognized the FAA's expertise in drawing these conclusions. In response to Plaintiffs' contentions that the chosen design was not required to build an effective cargo hub, the court noted, "the FAA reasonably determined otherwise. The agency found that the configuration would minimize delays and provide FedEx with several operational advantages .... Because the agency's determination is supported by substantial evidence, we defer to it." *Alliance v. FAA,* 69 Fed.Appx. at 622–23. The FAA's conclusions regarding the project purpose and design were well within the agency's zone of expertise and supported by substantial evidence. *See id.* After examining the FAA's information, the Corps could not reasonably claim that an alternative that the FAA found unsafe or logistically unworkable was a practicable alternative under the Clean Water Act.[14]

The Corps's determination that the FAA's alternatives analysis satisfied the Section 404(b)(1) Guidelines was not arbi-

14. Further, the record demonstrates that the Corps did not unthinkingly adopt the EIS. In August 1998, URS Greiner, the FAA's consultant for the EIS, requested the Corps's assistance in preparing the EIS "regarding the environmental analysis that will be undertaken." AR 4713–29. The Corps met with URS Greiner, PTAA, and the North Carolina Division of Water Quality to discuss various aspects of the project, including the alternatives analysis. At this meeting, the Corps emphasized that the "alternatives review must address the other sites considered and include the reasons why these sites were rejected." AR 4708.

The Corps also addressed the alternatives analysis in further meetings with PTAA. In one such meeting, "[a] brief overview of the onsite alternatives for the project was provided; [a Corps representative] stated that the EIS must address the site selection process, sites evaluated, and reasons for the elimination of all other sites." AR 4692; *see also* AR 4680–81 (meeting with PTAA at which "po-

tential runway alignments" and "new alternatives" were discussed). The Corps was kept abreast of the FAA's revisions to the alternatives analysis. *See* AR 5119 (PTAA E-mail notifying the Corps of change to "no build" alternative in the EIS). When the draft EIS was released, the Corps met with PTAA and FAA representatives to discuss its concerns. *See* AR 3711–12; 6772–75. During the public notice period, the Corps submitted comments on the draft EIS criticizing the FAA's explanation of its alternatives analysis. *See* AR 4671–73 (comment letter); 6942–43 (handwritten notes and questions on the three-tier scheme). PTAA also documented and explained why the project purpose precluded off-site alternatives and required the proposed configuration. *See* AR 5276–77; 7022–24. The Corps concluded that "PTIA appears to have covered its alternatives well in the DEIS prepared by FAA." AR 3661–62. The Corps's deference to the FAA's final EIS was a rational choice based on the FAA's expertise and the Corps's own participation in shaping the analysis.

trary or capricious. The Corps was justified in relying on the FAA's expertise to conclude that on-site alternatives lacking the proposed configuration were impracticable. The Corps also did not err in considering PTAA's objectives when making its Section 404 permit decision. Consequently, the Corps's ultimate conclusion that Alternative W1–A1 was the practicable alternative with the fewest adverse impacts on wetlands is supported by the record [15] and is not clearly erroneous.

## V. EPA Mitigation Ratios

■ Plaintiffs claim that the Corps has failed to satisfy EPA mitigation ratios to compensate for the destruction of 22.93 acres of wetlands associated with the project. Under the Section 404(b)(1) Guidelines, "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d). To this end, the Corps must take all appropriate measures to avoid and minimize the project's adverse environmental consequences. The agency also must designate suitable compensatory mitigation measures to offset unavoidable impacts. (See Pls.' Mem. Supp. Mot. Prelim. Inj., Ex. 18, at 1 ("Compensatory Mitigation Policy, Wetlands Section, Water Management Division, Environmental Protection Agency (EPA) Region 4," hereafter "Compensatory Mitigation Policy.")) Compensatory mitigation options include restoration, creation, enhancement, and preservation of wetlands. Id. at 6–7. The Section 404 permit application must include a compensatory mitigation plan containing a functional assessment of the impacted area, mitigation site information, and a

procedure for monitoring the success of the proposed mitigation. Id. at 4.

Plaintiffs' claim hinges on their interpretation of EPA's Region 4 Compensatory Mitigation Policy, which provides guidance in determining appropriate mitigation measures for the Section 404 permitting process. See generally Compensatory Mitigation Policy. The Compensatory Mitigation Policy supplies suggested ratios for each type of mitigation option: 2:1 for restoration (i.e., two acres restored for every one acre destroyed), 6:1 for creation, and a range of 10:1 to 60:1 for preservation of wetlands. Id. at 9–10. Plaintiffs reason that because PTAA will destroy 22.93 acres of wetlands but preserve only 69.9 acres of wetlands, create 17.9 acres of wetlands, and restore 13.4 acres of wetlands, PTAA's mitigation plan violates the Compensatory Mitigation Policy's ratio requirements.

Plaintiffs' argument fails because the particular mitigation ratios at issue are not "requirements" to obtaining a Section 404 permit. The EPA's Section 404(b)(1) Guidelines do not mandate that all dredge and fill projects must comply with specified mitigation measures. Instead, the Guidelines state that "appropriate and practicable steps" must be taken to minimize impacts. 40 C.F.R. § 230.10(d). The Guidelines list appropriate techniques for minimizing impacts, but this list does not contain a fixed mitigation ratio. See 40 C.F.R. § 230.70–77.

Moreover, the Compensatory Mitigation Policy does not "require" use of the ratios. Instead, the policy states that "[the] predetermined compensatory mitigation ratios are used as a guide.... [G]eneral compensatory mitigation ratios ... can assist in identification of an appropriate mitigation

---

**15.** See EA at 6 (AR 6099) (stating that Alternative W1–A1 impacted 24% of wetlands compared to other alternatives which impacted 37% of wetlands).

ratio, subject to case-by-case functional analysis of the impact and mitigation sites." Compensatory Mitigation Policy at i. The policy emphasizes that "[d]etermination of the appropriate type of mitigation should be made on a case-by-case basis, based upon the condition and needs of the watershed in which the impacts are proposed and the nature of the impacts." *Id.* at 4; *see* AR 3295 (Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army Concerning the Determination of Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines, "The determination of what level of mitigation constitutes 'appropriate' mitigation is based solely on the values and functions of the aquatic resource that will be impacted."). "[I]n the absence of site-specific functional models," the policy provides suggested ratios. Compensatory Mitigation Policy at 10.

Plaintiffs acknowledge that the ratios may be adjusted according to a functional analysis of the site, but contend that the Corps did not perform such an analysis. Plaintiffs posit that "a functional analysis would assess the wetlands impacted by the proposed project and the wetlands proposed as mitigation in order to compare the results." (Pls.' Mem. Opp'n Cross-Mot. of United States Summ. J. & Mot. of PTAA Summ. J. at 5.) In support of their claim, Plaintiffs contend that preservation is the least preferred mitigation option under the Compensatory Mitigation Policy but is the primary mitigation method for this project. *See* Compensatory Mitigation Policy at 7 ("Preservation does not typically replace lost wetland functions and leads to an overall net loss of wetlands.").

Determining the proper mitigation for a Section 404 permit is a task within the Corps's expertise and discretion. Consequently, *Corps guidance on mitigation plan development provides that no one method* is the "correct" way to conduct a functional analysis. Instead, the Corps is charged with analyzing each project and determining adequate mitigation based on its professional judgment. The guidance states that:

> Many different aquatic function assessment methodologies exist across the country. On a national basis, the U.S. Army Corps of Engineers does not recognize any one methodology as the best or most acceptable in all cases.... The Regulatory Division is currently involved in an interagency initiative to develop wetland and stream function assessment methodologies for use in North Carolina.... Until such time that these methodologies are developed, tested, and approved, the Regulatory Division will continue to utilize the best professional judgment of its project managers and resource agencies to make mitigation decisions.

AR at 7224–25 (Corps mitigation plan development guide).

In this case, the administrative record demonstrates that the Corps made a functional assessment of the project site using its professional judgment. The Corps obtained much information about the quality and functions of the impacted wetlands. For example, PTAA submitted multiple wetland and stream evaluations and revisions to the evaluations, AR 1993–2128; 2129–2268; 2269–86, a Conceptual Mitigation Report, AR 1058–96, and a Water Quality Assessment of Brush Creek, AR 933–66. The wetland and stream evaluations included reports regarding the soil and vegetation surrounding the airport. AR 2015–104. Using information about the site, the Corps conducted an independent, computer-based analysis which "address[ed] impacts to wetlands and ultimately the health and function of the area's surface waters." AR at 6136.

Based on the data before it, the Corps questioned the validity of many of PTAA's mitigation measures, especially with regard to replacing the lost functions of the impacted wetlands. *See* AR 535 (Corps' notation on mitigation plan indicating "we have already questioned the potential success of this"); 537 (notation on plan stating "[t]his plan talks in terms of credits. This is not how we do business"); 554 (notation concluding that PTAA was "[adding] acreage but not necessarily function"); 584 (notation approving of "same functions as impacted wetlands"). The agency repeatedly rejected PTAA's mitigation plans. *See, e.g.*, AR 3450–53; 3467–68; 3571–73. As a result, Corps engineers and PTAA representatives met and corresponded throughout the permitting process to discuss the mitigation requirements and ensure that the Corps' concerns were addressed. *See, e.g.*, AR 3363–86; 3553–71; 3711–12; 4692–94; 3425–27; 3665–3700; 5834; 5839. The record shows that the final wetland mitigation plan was not a rubber stamp, but a two-and-a-half-year process in which the Corps repeatedly criticized PTAA's submissions in light of the characteristics of the project site.

The fact that the Corps authorized the preservation of 69.9 acres of wetlands also supports the proposition that the Corps performed a project-specific, functional analysis of the PTAA property and made its mitigation decision based on that analysis. Specifically, the Corps found that preservation, which is generally not preferred, was feasible given its assessment of the project site. In the EA, the Corps explains:

> For the purpose of issuance of a Section 404 permit, compensatory mitigation has been assessed in regard to lost and impaired functions to jurisdictional waters .... [T]he proposed preservation property is an exceptional, high functioning, mature bottomland hardwood forest, consisting of 69.9 acres immediately adjacent to the proposed development sites. Accordingly, the separation/buffering of the development from the downstream Lake Higgins water supply reservoir makes this property a valuable resource providing critical aquatic functions relative to the functions being impacted by the proposed project.... Based on this rationale associated with the aquatic impacts of the proposed project, the proposed ratios are appropriate.

EA at 7, 25 (AR 6100, 6118). The Corps compared the nature of the existing wetlands to the mitigation options and decided that preservation of the superior quality wetlands would be more beneficial than creation or restoration of additional wetlands. *See, e.g.*, EA at 25 (AR 6118); AR 3450–54 (rejecting PTAA's plans to create wetlands because the new wetland functions would not replace the functions of the impacted wetlands). Plaintiffs' argument to the contrary is further undermined by the fact that EPA Region 4, which authored the policy upon which Plaintiffs base their claim, did not object to the Corps's mitigation ratios for the project. *See* EA at 24 (AR 6117); AR 5731–33.

Plaintiffs may disagree with the extent or type of mitigation that the Corps has chosen and the EPA has endorsed. However, the court "is not empowered to substitute its judgment as to the effectiveness of the mitigation measures for that of the Corps." *Sierra Club*, 484 F.Supp. at 468; *see B & J Oil & Gas v. Fed. Energy Regulatory Comm'n*, 353 F.3d 71, 76 (D.C.Cir.2004) ("Moreover, when agency orders involve complex scientific or technical questions, as here, we are particularly reluctant to interfere with the agency's reasoned judgments."). Because Plaintiffs cannot demonstrate that the Corps failed to perform a functional analysis or that the results of such an analysis were the product of a clear error of judgment, the court

will uphold the Corps's mitigation decisions.

## CONCLUSION

The Corps's decision to accept PTAA's alternatives analysis was not a clear error of judgment. Plaintiffs have cited no support for the proposition that the Corps can disregard the named applicant for a Section 404 permit and substitute another entity that benefits from the project. Even if Plaintiffs had made this showing, the administrative record in this case demonstrates that the Corps took steps to ensure that PTAA was the proper applicant. As a result, the Corps's determination that off-site alternatives were not practicable for the applicant was not arbitrary and capricious. The Corps's conclusion regarding PTAA's on-site alternatives also was not erroneous given the FAA's expertise in airport design and logistics and the Corps's duty to consider PTAA's objectives. Finally, the administrative record shows that the wetland mitigation plan ultimately approved by the Corps followed a thorough functional analysis and was far from a rubber stamp of PTAA's proposals.

For the foregoing reasons, Plaintiffs' motion for summary judgment will be denied and Defendants' motion for summary judgment will be granted.

An order and judgment in accordance with this opinion shall be entered contemporaneously herewith.

### ORDER and JUDGMENT

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED that Plaintiffs' motion for summary judgment [Doc. # 25] is **DENIED**.

IT IS ORDERED AND ADJUDGED that the motion for summary judgment [Doc. 31] of Defendants United States Army Corps of Engineers, Lieutenant General Robert B. Flowers, and Colonel Charles R. Alexander is **GRANTED**, and this action is **DISMISSED with prejudice** as to Defendants United States Army Corps of Engineers, Lieutenant General Robert B. Flowers, and Colonel Charles R. Alexander.

IT IS FURTHER ORDERED AND ADJUDGED that the motion for summary judgment [Doc. # 34] of Defendant Piedmont Triad Airport Authority is **GRANTED**, and this action is **DISMISSED with prejudice** as to Defendant Piedmont Triad Airport Authority.

IT IS FURTHER ORDERED that Defendant Piedmont Triad Airport Authority's motion to dismiss [Doc. # 16] is **MOOT**.

IT IS FURTHER ORDERED that Plaintiffs' motion for declaratory judgment [Doc. # 42] is **MOOT**.